## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-46-2 (RDM)** |
| **BRADY KNOWLTON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brady Knowlton to 12 months of incarceration, the statutory maximum and an upward variance from the advisory Guidelines range, 12 months of supervised release, $500 in restitution, a $25,000 fine, and a mandatory assessment of $25, on his conviction of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).

### I.    INTRODUCTION

The defendant, Brady Knowlton, and his co-defendants, Patrick Montgomery and Gary Wilson,[1] participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred

---

[1] This Court sentenced Montgomery on October 31, 2024, to 37 months of incarceration and 36 months of supervised release, and it sentenced Wilson on July 2, 2024, to 30 days of incarceration, 12 months of supervised release, and $500 in restitution.

police officers, and resulted in more than 2.9 million dollars in losses.[2]

Knowlton intentionally disrupted the certification of the electoral college vote on January 6. He was among the rioters who forced the Senate to evacuate its chamber and suspend its Constitutional duty to certify the results of the 2020 presidential election. Knowlton confronted and berated police officers numerous times during his illegal journey through the Capitol, making it more difficult for police to clear and secure the Capitol.

Knowlton's conduct on that day was aggressive and highly confrontational. The Court must consider that the Knowlton's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the government recommends that the Court sentence Knowlton to 12 months of incarceration, a sentence which reflects the gravity of his conduct, which includes both trespassing onto Capitol grounds and into the Capitol building and disrupting the certification with corrupt intent.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Facts for Stipulated Trial filed in this

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

case, ECF No. 233 at Section II, ¶¶ 1-7, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

**B.      Knowlton's Role in the January 6, 2021, Attack on the Capitol**

On the morning of January 6, 2021, Montgomery, Knowlton, and Wilson, who were prior acquaintances and planned to attend the "Stop the Steal" rally together, met at the Yours Truly hotel in Washington, D.C., as planned. When they left the hotel, Knowlton was wearing a flak jacket. The three agreed that, if there was violence against the Trump supporters in the afternoon, they would stick together.

After leaving the hotel, they walked to an area near the Washington Monument and the Ellipse to hear the speakers at the rally. Montgomery, Knowlton, and Wilson were present for some of President Trump's speech at the Ellipse. By 2:01 p.m., they had crossed into the restricted area on Capitol grounds, near the scaffolding that had been erected on the west front of the U.S. Capitol. At that time, MPD officers were attempting to move through the crowd, closer to the Capitol building. As the Court noted during the bench trial, at this time, Knowlton launched "an aggressive and angry exchange with police officers, challenging them about their oaths … in an aggressive and highly confrontational way... [that] could only be perceived by the officers at that time as confrontational and aggressive." Trial Tr. 3/20/24 at 6:21-24.

Within moments of this exchange, at approximately 2:02 p.m., Knowlton saw Montgomery approach Officer D.H. from the side, grab the officer's baton, and try to wrestle it away from him. Officer D.H. held onto the baton, and he and Montgomery fell to the ground. While on the ground, Officer D.H. and Montgomery attempted to wrestle control of the baton from each other. To gain

leverage over the officer in their fight over the baton, Montgomery kicked Officer D.H. directly

and forcefully in the chest, as depicted in Image 1, which is a screenshot from Officer D.H.'s body-

worn camera footage.



*Image 1: Screenshot from Officer D.H.'s body-worn camera footage (Stipulated Trial Exhibit 1)*
*showing MONTGOMERY kicking Officer D.H.*

At approximately 2:28 p.m., Montgomery, Knowlton, and Wilson ascended the Northwest

Stairs, leading to the Upper West Terrace, with a mass of rioters who were "jeering loudly" (Trial

Tr. 3/20/24 at 7:4).



*Image 2: MONTGOMERY (green), KNOWLTON (red), and WILSON (yellow), ascending the Upper West Terrace Stairs.*

As the three approached the building, other rioters had propped open the exterior double doors, rioters were screaming loudly, and a loud alarm was sounding as rioters streamed into the Capitol. Signs on the inside of the doors stated, "EMERGENCY EXIT ONLY," and there were storage boxes present, making it clear that this was not a legitimate entrance into the building. Knowlton knew he was not allowed to enter the building at that time. *See* Stipulated Trial Exhibit 16, 8:40 to 9:41.

At approximately 2:35 p.m., Montgomery, Knowlton, and Wilson entered the United States Capitol Building through the Upper West Terrace Door, with Knowlton in the lead.



*Image 3: MONTGOMERY (green), KNOWLTON (red), and WILSON (yellow), entering the Capitol Building through the Upper West Terrace Door.*

At approximately 2:35 p.m., USCP Lt. D.M. stood in the interior of the Upper West Terrace Door, near the stairs leading up to the Rotunda. Stipulated Trial Exhibit 16, 9:00. Lt. D.M. and his fellow officers were severely outnumbered by the rioters entering through the Upper West Terrace Door. Montgomery, Knowlton, and Wilson walked past Lt. D.M. as part of a long procession of rioters. Lt. D.M. decided not to escalate the situation, and instead to take a defensive position for the safety of his fellow officers and the rioters.

After entering the Capitol building, Montgomery, Knowlton, and Wilson climbed the stairs to the second floor and entered the Rotunda at approximately 2:36 p.m. They left the Rotunda two minutes later and climbed the stairs to the third floor.

As the Court determined, to gain unauthorized entry into the Capitol building, the three passed through a "riotous situation where it was clear that the police officers were outnumbered, [the] situation was out of control, [and] individuals were acting in aggressive and violent manners." Trial Tr. 3/20/24 at 8:7-9. At approximately 2:40 p.m., Montgomery, Knowlton, and Wilson

walked down the hallway on the third floor towards the Senate Gallery when Knowlton proclaimed, trying to rile up his fellow rioters, "We have a right to choose our electors! We're not going to have communist China choose them for us! We're not going to have the Democratic Party choose them for us!"

At approximately 2:43 p.m., Montgomery, Knowlton, and Wilson stood outside the Senate Gallery where several USCP officers were present. One of the officers was trying to lock the doors to the Senate Gallery. Some rioters yelled, "Don't you lock another door!" and "Grab the door!" as others assaulted two of the USCP officers. At this Court determined, "these officers were in danger. They were violently assaulted. There were a number of individuals with their fists raised and Messrs. Montgomery, Knowlton, and Wilson were standing right there as these officers were violently assaulted in order to keep the doors to the Senate gallery open, so that individuals could enter the gallery … they are taking advantage of the fact that these police officers … have just been assaulted in order to gain entry to the Senate gallery." Trial Tr. 3/20/24 at 8:25-9:1-5, 9-12.

Immediately after those assaults, Montgomery, Knowlton, and Wilson were among the first rioters to enter the Senate Gallery. By then, the Senators and staff had evacuated the Senate Floor and Gallery.

While inside the Senate Gallery, Wilson and other rioters, within earshot of Knowlton, chanted, "Treason! Treason! Treason!" At approximately 2:47 p.m., Knowlton, while inside the Senate Gallery, stole an escape hood, [3] which is government property, from underneath a seat, and

---

[3] An escape hood is protective equipment that a user puts over his head to prevent breathing in smoke or contaminated air.

took it with him when he exited the Gallery. Stipulated Trial Exhibit 5 at time stamp 0:43 to 1:25. Wilson stole a black bag containing multiple escape hoods. *Id*. at time stamp 1:10.

After witnessing another rioter jump down from the Senate Gallery to the Senate Floor, Montgomery, Knowlton, and Wilson exited the Senate Gallery. They went downstairs to the second floor of the Capitol, and proceeded through the Ohio Clock Corridor. There, as the Court observed, Knowlton, after seeing the police in the hallway, turned back and out of frame of the camera capturing the hallway, but "appear[ed] to be conferring with Mr. Montgomery and Mr. Wilson at this point." Trial Tr. 3/20/24 at 8:14-16. Once back in the frame of the camera, Knowlton "very clandestinely thr[ew] the package to the ground that he had in his hand." *Id.* at 8:16-18. This was the escape hood that he had stolen from the Senate Gallery. This series of events is captured in Stipulated Trial Exhibit 7, time stamp 0:37 to 0:50.



*Image 4: KNOWLTON discarding escape hood on the floor of the Ohio Clock Corridor.*

The three then walked to an area near then-Senate Minority Leader Charles Schumer's office. There, they confronted USCP Officer B.M.

8



*Image 5: KNOWLTON (red), MONTGOMERY (green), and WILSON (yellow) confronting USCP Officer B.M. (blue) outside of Senator Schumer's office.*

Officer B.M. was assigned as a Senate Chamber Officer on January 6, 2021. At approximately 2:49 p.m., he was standing in front of Senator Schumer's office near an entrance to the Senate Floor. In that area, there were clear indications that the Senate Floor was close-by, such as signs and pamphlets that said "Senate" and police presence. Officer B.M.'s assignment was to prevent anyone from entering the Senate from that area. Because USCP radio communication was down, Officer B.M. believed that the Senators were inside the Senate Chamber. Because the rioters had entered the building without authorization and without submitting to screening, Officer B.M. did not know whether they were armed. Officer B.M. recalled that Montgomery, Knowlton, and Wilson were more aggressive than the other rioters he had encountered on that day.

Knowlton approached Officer B.M., got very close to him, and made a jabbing motion with his finger, almost touching Officer B.M., while he said: "This is a moment in history [unintelligible]. Right now is a moment in history. We don't wanna push through there." "We do not wanna push through there. What side [unintelligible]? [unintelligible] try right now.

[unintelligible] heavy on you, brother." He also said: "You have a moment right now. [unintelligible] All you gotta do is step aside. You're not getting in trouble. Stand down." *See* Stipulated Trial Exhibit 10 at 14:50:33-58.

Officer B.M. did not interpret these statements as expressing sympathy for or solidarity with police. Rather, Officer B.M. reasonably understood Knowlton's and Montgomery's words and conduct as threatening, and aimed at getting him to leave his post so that Knowlton and Montgomery could confront Senators inside the Senate Chamber. Officer B.M. did not yield to those threats and stood his ground.

The Court itself described Knowlton's conduct here as "quite aggressive" and "violent" in its findings of fact: "Mr. Knowlton, in particular, is quite aggressive with Officer B.M. And as I think I indicated in my questioning, during the parties' arguments, it is not entirely clear to me whether Mr. Knowlton is actually jabbing his finger at times into Officer B.M.'s chest or coming very close. But he is right in his face, and he is jabbing his finger in a violent way right at him, is clearly angry and aggressive in his interaction with Officer B.M. at that point." Trial Tr. 3/20/24 at 12:25-13:1-7.

Officer B.M. believed that Montgomery, Knowlton, and Wilson only left the area once there was increased police presence and because it was clear that he was not going to let them through into the Senate Chamber.

Montgomery, Knowlton, and Wilson exited the Capitol building at approximately 2:53 p.m. After exiting the Capitol, they did not leave the Capitol grounds. Instead, they went to the East Plaza, where a large mass of rioters had gathered. Knowlton climbed atop a police SUV and attempted to further incite the crowd. Although the Government does not have video of

Knowlton's words, it is clear from his facial expression that he is yelling and agitated.



*Image 6: KNOWLTON stands atop a police SUV, hand raised and yelling.*

### III.   THE CHARGES AND BENCH TRIAL

On August 19, 2022, a federal grand jury returned a Third Superseding Indictment charging Montgomery, Knowlton, and Wilson with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); and entering and remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B). ECF No. 115. Knowlton and Wilson were also charged with theft of government property, in violation of 18 U.S.C. § 641, for stealing an escape hood. *Id.*

On March 18, 2024, the Court conducted a bench trial based on a set of stipulated facts.

ECF No. 233. At trial, the government proceeded against all three defendants on Count Ten of the Third Superseding Indictment, which charged a violation of 18 U.S.C.§§ 1512(c)(2) and 2. ECF No. 115. In addition, the government proceeded against Montgomery on Count One, against Knowlton on Count Five, and against Wilson on Count Eleven. *Id.*

While the parties agreed to a set of facts, they did *not* agree that Knowlton's conduct met the elements of Count Ten. *See* ECF No. 233 at ¶52. The parties *did* agree, however, that if the Court found the existence of the stipulated facts beyond a reasonable doubt, this evidence would establish each and every element of Counts One, Five, and Eleven. *See id.* at ¶53.

On March 20, 2024, the Court convicted Knowlton of Count Five, Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1), and Count Ten, Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2.

On June 28, 2024, the United States Supreme Court decided *Fischer v. United States*, 144 S. Ct. 2176 (2024), holding that § 1512(c)(2) requires proof that the defendant impaired or attempted to impair "the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding," and remanded the case to this Court for further proceedings. *Id*. at 2190.

After careful consideration of *Fischer*, the government moved to vacate Knowlton's § 1512(c)(2) conviction, ECF No. 262, which the Court granted, Minute Order 10/9/24.

Knowlton now faces sentencing on Count Five, Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1).

## IV.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Knowlton faces one year of imprisonment, a term of supervised release of not more than one year, a term of probation of not more than 5 years, a fine up to $100,000, restitution, and a mandatory special assessment of $25.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Government calculates the Guidelines for Montgomery as follows.

### A.  Analysis for Count of Conviction

### Count Five: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)

The Statutory Appendix lists two potentially applicable guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1), which is essentially a trespass offense.

| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Special Offense Characteristic: Restricted Building or Grounds | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Total | 6 | |

### B. Acceptance of Responsibility

To determine whether a defendant clearly demonstrates acceptance of responsibility for his offense and therefore is eligible for a two-level decrease pursuant to U.S.S.G. § 3E1.1, it is appropriate for the Court to consider whether the defendant has truthfully admitted the conduct comprising the offense of conviction, and whether he has truthfully admitted or not falsely denied any additional relevant conduct for which the defendant is accountable under the Relevant Conduct guideline. U.S.S.G. § 3E1.1 cmt. n. 1(A). Based on those considerations, Knowlton has not accepted responsibility for his conduct and is not entitled to the downward adjustment.

Despite agreeing in a stipulation that his conduct met the elements of trespass as charged in Count Five, at the bench trial, Knowlton breached this agreement and disputed that his conduct met those elements. During closing argument at trial, Knowlton's attorney contended Knowlton did not trespass onto Capitol grounds or in the Capitol building, arguing that because he did not break down a door or push a police officer, and because no police officer explicitly told him that he was not allowed inside, he lacked intent to enter someplace he was not allowed to enter. Trial Tr. 3/18/24 at 47:8-18. The Court rejected this premise when it convicted Knowlton of the trespass charge and noted that his argument ignored the context in which the trespass took place, which was that "[the defendants] went through a riot to get there." *Id.* at 75:13.

This argument was not a creation of Knowlton's attorney—it came from Knowlton himself. In May 2022, the FBI discovered a video on YouTube titled, "Video of Brady Knowlton Entering the Capitol January 6th with Police Permission." Sentencing Exhibit 1. Knowlton himself narrates the video. The video's message is that the police allowed the rioters into the Capitol. Knowlton doubled down on that lie by stating that the police allowing entry "came as no surprise" because

14

it "seemed to be an extension of behavior exhibited by police earlier at the lower Capitol grounds, where they offered words of encouragement and made sympathetic remarks." Sentencing Exhibit 1 at 1:37-2:07.

The assertions in the video stand in stark contrast to the reality unfolding on the West Plaza on January 6. Officer D.H.'s body worn camera shows Knowlton yelling "Are you our brothers?! You took an oath!" at the police continually, while pointing at them aggressively, in the middle of what is clearly a riot. Stipulated Trial Exhibit 1 at 14:01:12-34. The YouTube video was blatantly dishonest and self-serving.

This video and Knowlton's attorney's arguments at trial amount to a factual contestation of the necessary intent for Knowlton's conviction, the antithesis of acceptance of responsibility, thus disqualifying Knowlton from the benefit of this two-level reduction.

### C. Criminal History

The U.S. Probation Office calculated that Knowlton has no criminal history points and his Criminal History Category is I. ECF No. 237 ¶ 61. The Government does not dispute this calculation. Despite having no criminal history points, Knowlton is not eligible for an adjustment pursuant to U.S.S.G. § 4C1.1, because U.S.S.G. § 4C1.1(a)(3) applies, since Knowlton used violence or credible threats of violence in connection with the offense. Specifically, Knowlton's conduct with respect to Officer B.M. near an entrance to the Senate Chamber, as described above, disqualifies him from this adjustment. Knowlton was communicating to Officer B.M. in no uncertain terms that if he did not "stand down," the rioters would forcibly push through him to gain access to Senate Chamber.

Consistent with the Court's own observations that Knowlton's behavior was "quite aggressive" and "violent," *see* Trial Tr. 3/20/24 at 12:25-13:1-7, the Court should interpret Knowlton's conduct as a using a credible threat of violence in connection with the offense and deny application of U.S.S.C. § 4C1.1. But even if the Court were to apply that downward adjustment, Knowlton's Guidelines range would remain 0-6 months.

### D.  Guidelines Range

At offense level 6 and Criminal History Category I, Knowlton's Guidelines range is 0 to 6 months of incarceration.

### E.  Other Guidelines Considerations

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Knowlton's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range to a sentence of 12 months of imprisonment.

Knowlton was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Knowlton "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were

responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), Sent. Tr. 9/22/22 at 86-87.

But nothing in Knowlton's Guidelines calculation reflects these facts. Knowlton would face the same offense level if his crime had not endangered the democratic process or interfered with the peaceful transfer of power.[4] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116 (DLF), Sent. Tr. at 85. So a sentence within Knowlton's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The

---

[4] In *United States v. Brock*, the D.C. Circuit's held that certain enhancements in U.S.S.G. § 2J1.2 did not apply to Congress's counting and certification of the electoral college votes, but acknowledged that interference with this process, "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" 94 F.4th 39, 59 (D.C. Cir. 2024). That demonstrates the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *Fischer* demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See* 144 S. Ct. at 2195 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[5] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75 (RDM), Sent. Tr. at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

- "January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy." *United States v. Perkins*, 21-CR-147 (CJN), Sent. Tr. at 53.

- "He just wanted to delay the certification. He wanted the election certification stopped. That's chilling to me. I mean, that is not a minor thing, in that through -- through acts of violence and intimidation, we're going to stop the most sacred day

---

[5] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

> in our democracy from occurring, which is the certification of the election, because we want some more time to try and make our case because the dozens and dozens of courts that have considered the issue and have concluded there was not a problem with the election weren't enough, and because I want someone else to take another look at this. And so, therefore, I'm going to go down to the Capitol and I'm going to stop the certification of the election from occurring. So I think that the offense here, to my mind, is one of enormous gravity." *United States v. Wyatt*, 23-CR-215 (RDM), Sent. Tr. at 44.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157 (TNM), 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287 (TNM), 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513 (RBW), 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618 (ABJ), 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244 (TNM), 5/8/23 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-CR-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127 (ABJ), Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87 (TJK), Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the

§ 1512(c)(2). Following that dismissal, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly pointed out that despite the dismissal of the § 1512(c)(2) count, Sparks' conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sent. Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. Judge Kelly found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, Judge Kelly applied a significant upward departure under both U.S.S.G. §§ 5K2.7 and § 5K2.21. He also stated that, in the alternative, an upward variance of equal amount was warranted under the § 3553(a) factors. Judge Kelly sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34 (CRC), Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a

governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36 (RBW), Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36 (RBW), ECF No. 90, at 2. From an advisory range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

And in *United States v. Oliveras*, 21-CR-738 (BAH), Judge Howell sentenced the defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because

> after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy… His intent to obstruct Congress in the Electoral College certification

> by violence, if necessary, go above and beyond what any of his current convictions
> now take into account.

*Oliveras*, 21-CR-738 (BAH), Sent. Tr. at p. 49. The court noted that "[i]n assessing the extent of

the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G.

§] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide… [and] an upward

departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose

the same sentence with… an upward variance for the same reasons that are outlined in 5K2.7 and

consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37-46

months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Likewise here. Because the seriousness of Knowlton's crime is not adequately captured by

the applicable Guideline, an upward departure is appropriate. If the Court declines to depart, an

upward variance is warranted. An upward variance is appropriate when "the defendant's conduct

was more harmful or egregious than the typical case represented by the relevant Sentencing

Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range,

"*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the

Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To

reduce [defendant's] sentence . . . would require this Court to take a drastically different view of

[defendant's] conduct." *United States v. Hostetter*, 21-CR-392 (RCL), ECF 507, at 4-5 (cleaned

up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes

that the defendant intended to obstruct Congress' certification of the electoral vote in determining

whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sent.

Tr. at 95. *See also United States v. Kelly*, 21-CR-708 (RCL), ECF No. 151, at 5 ("Nothing about

*Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6 (TJK), Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this court has made clear its view that January 6 was "a stain on the history of this nation." *United States v. Miller*, 21-CR-75 (RDM), Sent. Tr. at 67. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[6]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Meredith*, 21-CR-159 (ABJ), Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

In addition to departing upwards, other courts have varied upward from the advisory

---

[6] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-32 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638 (TJK), Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[7]

---

[7] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that Knowlton's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

In this case, the government submits that an upward variance and/or departure of six months is warranted to reach an appropriate sentence.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Knowlton's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Knowlton intentionally contributed to the disruption of the certification of the electoral college vote on January 6. He was among the rioters who forced the Senate to evacuate its chamber and suspend its Constitutional duty to certify the results of the 2020 presidential election. Knowlton confronted police officers numerous times during their illegal journey through the Capitol, making it more difficult for police to clear and secure the Capitol.

The nature and circumstances of Knowlton's offense were of the utmost seriousness, and fully support the Government's recommended sentence. If Knowlton were being sentenced on both counts of conviction – § 1752(a)(1) and § 1512(c)(2) – his total offense level would have been 14, based on the grouping analysis. At total offense level 14 and Criminal History Category I, his Guidelines range would have been 15 to 21 months of incarceration. The government's recommendation of 12 months is below that range, by necessity, as 12 months is the statutory maximum on a § 1752(a)(1) conviction. A sentence of 12 months is appropriate, because even

though Knowlton's counts of conviction have changed, his criminal conduct has not.

### B. Knowlton's History and Characteristics

Knowlton is employed as an executive vice president at a financial consultancy, where he has worked since 2003. He also owns a software company, as well as a restaurant in Mexico. ECF No. 237 at ¶¶ 101-104.

Knowlton has no criminal history. *Id.* at ¶ 60.

Knowlton reported childhood trauma to Probation. *Id.* at ¶ 75. He also reported that he has full custody of his two children, one of whom is diagnosed with autism and has been in therapy since a young age. *Id.* at ¶ 77. The child diagnosed with autism was in residential treatment for over one year, until May 2024, *id.* at ¶ 78, and so has not lived with Knowlton for much of the past year and a half.

The Court should not grant Knowlton a downward variance due to his childcare responsibilities. His total net worth is estimated at $6.1 million, ECF No. 237 ¶ 106, so he can afford to pay a significant amount of money for high-quality care of his children. Additionally, Knowlton acknowledges that his relationship with his older brother, once strained, is now "great." ECF No. 237 ¶ 73. Although the brother travels extensively as a hunting and fishing guide, he could be a custodian for both children while Knowlton is incarcerated. Owing to his substantial wealth, Knowlton could easily compensate his brother for any lost earnings he sustained in order to care for the children.

### C.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. As discussed above, the crime was of an unprecedented nature. Thus, the need to promote respect and deter future crime is equally important. The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[9]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Meredith*, 21-CR-159 (ABJ), Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

#### *Specific Deterrence*

The need for the sentence to specifically deter Knowlton also weighs heavily in favor of a term of incarceration. During the pendency of this case and at trial, Knowlton has never shown remorse for his conduct and has continually shifted blame from himself for his own conduct. This

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[9] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

lack of remorse is particularly clear in the YouTube video that he narrates. Knowlton's lack of remorse and acceptance of responsibility is described in detail above.

### D.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government's request for a departure and/or variance is not intended to diminish the importance of the Guidelines. The government is requesting that the Court also consider factors that are not adequately captured by the Guidelines due to a change in the state of the law.

### E.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and

consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-CR-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[11] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Andrew Johnson*, 22-CR-414 (JEB), the defendant pleaded guilty to four misdemeanors, including violations of 18 U.S.C. § 1752(a)(1) and (a)(2). Chief Judge Boasberg sentenced Johnson to 12 months of incarceration. Unlike Knowlton, Johnson was not found to have had a corrupt intent to obstruct the Congressional proceeding essential to the peaceful transfer of power, However, Johnson possessed a weapon and had a criminal history category of II. These difference balance out; Knowlton deserves a sentence similar to Johnson.

In *United States v. William Calhoun*, No. 21-CR-116 (DLF), the defendant, a practicing lawyer, was convicted after a jury trial of violating 18 U.S.C. § 1512(c)(2) and committing four misdemeanors. Judge Friedrich sentenced Calhoun to 18 months of incarceration. Calhoun specifically stated that he wanted to stop the Congressional certification. Similarly, Knowlton proclaimed, "We have a right to choose our electors! We're not going to have communist China choose them for us! We're not going to have the Democratic Party choose them for us!" Unlike Knowlton, Calhoun perjured himself at trial; therefore, Knowlton should receive a lesser sentence than Calhoun.

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). As Knowlton was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because Knowlton, in this case, engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold each defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

Specifically, the Court should require Knowlton to pay $500 in restitution for his conviction on Count Give. This amount fairly reflects Knowlton's role in the offense and damages resulting from his conduct. Moreover, in cases where the parties have entered into a plea agreement, $500 in restitution for misdemeanor pleas has consistently been the agreed-upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense

to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Knowlton's conviction for 18 U.S.C. § 1512(c)(2) is subject to a statutory maximum fine of $250,000, and his conviction for 18 U.S.C. § 1752(a)(1) is subject to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b).

Knowlton's net worth exceeds six million dollars, ECF No. 237 ¶ 106. He clearly has the ability to pay a substantial fine. Pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). In determining the amount of the fine, the Court must consider the burden that the fine places on the defendant. § 5E1.2(d)(2). The guidelines fine range here is $1,000 to $9,500. However, given the government's argument for an upward departure and/or variance, and given Knowlton's net worth, the Court should impose a fine of $25,000 to ensure the fine is adequately punitive. *See* § 5E1.2, cmt. n. 4.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Brady Knowlton to 12 months of incarceration, the statutory maximum, 12 months of supervised release, $500 in restitution, a $25,000 fine, and a mandatory assessment of $25.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
202-803-1612
carolina.nevin@usdoj.gov