## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

BRADY KNOWLTON,

     *Defendant.*

Criminal Action No. 21-46 (RDM)

## DEFENDANT BRADY KNOWLTON'S
## SENTENCING MEMORANDUM

TO THE HONORABLE RANDOLPH D. MOSS, UNITED STATES DISTRICT JUDGE FOR THE DISTRICT OF COLUMBIA:

BRADY KNOWLTON, Defendant in the above styled and numbered cause, by and through undersigned counsel, submits the follow memorandum to assist this Court in fulfilling its duties under 18 U.S.C. § 3553 to assess an appropriate sentence in his case.

Almost a month after the events of January 6, 2021 at the United States Capitol, USA Today published a "fact check" article that is worth some consideration here. *See* Rick Rouan, "Fact check: Post comparing Capitol riot to 2018 Kavanaugh protests lacks context," USA TODAY, Feb. 3, 2021.[1]

The article focused on a social media post circulating shortly after January 6 that depicted images of "protesters being removed by U.S. Capitol Police, pounding

---

[1] Available at https://www.usatoday.com/story/news/factcheck/2021/02/2003/fact-check-capitol-riot-2018-kavanaugh-protests-meme-lacks-context/434379000120/.

on the doors of the Supreme Court and occupying the Capitol steps" during the confirmation hearings for Justice Brett Kavanaugh in September 2018 with a caption reading: "No this was not yesterday. This was in 2018 when the liberals and Democrats stormed the Capitol building and the Supreme Court building and disrupted and desecrated them over Judge Kavanaugh, or did we all forget about that." *Id.*

The article continued by explaining in further detail some accounts of protestors' actions during the Kavanaugh hearings, noting *inter alia*, "While some people protested outside, others waited in line for tickets to the confirmation hearing, where they stood to disrupt senators' questioning of Kavanaugh, according to Reuters." *Id.* The article also noted, "Inside the Hart Senate Office Building, protesters unfurled banners and even directly confronted Sen. Jeff Flake, R-Ariz., according to USA TODAY. Several were taken out of the Dirksen Senate Office Building in plastic cuffs." *Id.* Further, it pointed out, "While protesters did push past a police barricade in front of the steps of the Supreme Court to pound on its doors, according to NBC News, USA TODAY could find no reference to protesters entering the Supreme Court building." *Id.*

The article then turned to the Capitol riot on January 6. *Id.* It started by stating, "Although both demonstrations brought thousands of people to the Capitol, the Jan. 6 insurrection that followed a speech from then-President Donald Trump left both demonstrators and police injured or, in some cases, dead." *Id.* It then continued by pointing out that "Video and images from the riot show demonstrators beating a

police officer with objects, including a hockey stick; assaulting a photographer; carrying zip-tie handcuffs, and breaking out windows in the Capitol." *Id.* It then used the following quote from former Capitol Police Chief Steven Sund: "These individuals actively attacked United States Capitol Police Officers and other uniformed law enforcement officers with metal pipes, discharged chemical irritants, and took up other weapons against our officers. They were determined to enter into the Capitol Building by causing great damage." *Id.*

The article ends with a conclusion that should weigh heavily on this Court's mind:

> A post equating the Jan. 6 riot at the U.S. Capitol to 2018 demonstrations against the confirmation of Brett Kavanaugh to the Supreme Court is MISSING CONTEXT, based on our research, *because without additional information it could be misleading.*

*Id.* (emphasis [CAPS] in original; emphasis [italics] added). The post was not entirely FALSE. Rather, it recognized the importance of "CONTEXT" and how "additional information" is essential. Here is the "additional information" worth considering.

Brady Knowlton did not come to Washington D.C. to participate in a riot.

He did not "beat a police officer with objects, including a hockey stick" or come here intending to do the same.

He did not "assault a photographer."

He did not "carry zip-tie handcuffs."

He did not "break out windows in the Capitol."

He did not "actively attack United States Capitol Police Officers and other uniformed law enforcement officers with metal pipes" or any other type of weapon.

He did not "discharge chemical irritants."

He did not "take up other weapons against our officers."

He certainly was not "determined to enter into the Capitol Building by causing great damage" and, in fact, caused no damage to the building whatsoever.

He yelled at police officers probably no differently than protestors did in 2018 during the Kavanaugh hearings. But he never threatened them with violence or demonstrated an intent to harm them.

He walked past barricades and through an open emergency exit leading into the building, but he never laid a hand on or said a threatening word to the multiple Capitol Police Officers standing there demonstrating no resistance or making any effort to impede his entry into the building.

He shouted his beliefs about the 2020 election as he walked through the hallways of the Capitol, just as protestors shouted their own beliefs throughout the hallways of Capitol buildings and grounds concerning the nomination of Justice Kavanaugh.

He observed others engaged in violent acts. But he engaged in no such violence himself as this Court recognized. *See* Transcript of Bench Trial, ECF Dkt. 231 at 30.

As this Court further recognized, he was "exceedingly aggressive" in his interactions with officers. *Id.* at 31. But this "exceedingly aggressive" behavior did not appear any worse than what was seen in the protests during the Kavanaugh hearings in 2018 or any other publicized protests in the last 50 years.

4

Yes. Brady broke the law. Yes, he admittedly and undeniably entered a re-
stricted area and engaged in disruptive and unacceptable conduct in and around the
Capitol building much like some of the nearly 500 protestors that had been arrested
over several days as the Kavanaugh hearings were taking place in September 2018.
Like them, he expressed disapproval with Congress proceeding in the manner that
they were in a disruptive manner.

So where does the problem lie? The problem is that he has been treated differ-
ently. Not because he personally did anything much different than some of those ar-
rested back in September 2018. But because the actions of several others on January
6, turned what he thought was going to be a protest into a riot. But that was only the
beginning.

Rather than single out those individuals who engaged in riotous violence and
destruction and prosecute them as they rightfully should be prosecuted in these Dis-
trict Courts for felony offenses, the Department of Justice chose to prosecute him and
thousands of other non-violent protestors in these District Courts and even went so
far to try and use a statute in an unprecedented and unmethodical manner to convict
him of a felony offense.

He was lumped into a group of American citizens with certain similar beliefs
and classified as a "terrorist," when everything about him as a human being and eve-
rything he has done with his life up until this point has demonstrated that he is an-
ything but. All his good deeds and work in his life to help others — entirely ignored.

It all created a feeling of frustration that this is a political prosecution and that

courts, including this one, were willing to some degree to let it carry on as the prosecution wishes. It created an impression that he is being prosecuted and punished not so much for his actions, but for his political beliefs and worse, for exercising his protected First Amendment right to free speech.

So, yes. While he has accepted responsibility and shown remorse for his actions on January 6, he is upset about being prosecuted in the manner that he has. They are not mutually exclusive.

Yes. While he regrets his actions on January 6 and is ashamed to watch how he and others acted that day, he finally feels some sense of relief in that over 76 million Americans, an unequivocal majority of voters, elected Donald J. Trump earlier this month despite all that the President-Elect did to contribute to what occurred at the Capitol on January 6 and despite his repeated promise to the American public to pardon people like Brady.

Yes. While he is prepared to accept this Court's sentence, he is relieved that, unlike the Department of Justice, Trump has recognized the distinction between people like him and the people who engaged in riotous violence and destruction, promising to "pardon many of them," but not "every single one, because a couple of them, probably got out control."[2]

But equally true is that for the past nearly four years, Brady has paid a considerable and devastating price for his actions on January 6 that cannot be ignored.

_____

[2] Colleen Long and Dan Merica, "Trump on Day 1: Begin deportation push, pardon Jan. 6 rioters and make his criminal cases vanish," Associated Press, Nov. 12, 2024 (available at https://apnews.com/article/trump-day-1-priorities-deportations-drilling-ukraine-6747c6e64b0440978f59450b928f61d1). Brady recognizes and does not dispute that it was more than just a "couple of them."

His marriage crumbled and resulted in divorce after discovering his ex-wife engaged in an illicit affair with an underage minor, one of his son's best friends. He was kicked out of law school in his final semester. He has lost millions of dollars in various business ventures because no one wants to work with a "terrorist." He has struggled to raise his two children on his own — one of which is severely autistic with a comorbidity on the schizophrenia spectrum and has required special treatment to deal with her psychological instability — in an environment where they have been shunned by others because of their father's actions.

And now, the prosecution wants to deal its final blow to this crushed man. Even though the final bell has rung, and Brady has retreated to his own corner, this Court is allowing the Government to go over to him and get one final punch in before the fight is called. All his good deeds and work in his life to help others are entirely ignored by them. Without good reason or justification beyond the political disagreement of what he did and what occurred on January 6, the Government insists that he should be subject to the maximum penalty prescribed by law.

As attorney Bryan Stevenson wrote in his acclaimed book, *Just Mercy*, "Each of us is more than the worst thing we've ever done." The presentence investigation report in Brady's case only gives a glimpse into the person he really is and attempts to define him by the worst thing he has ever done in his life.

The reality is that Brady has spent his entire life working hard to contribute to society and others in the best way possible. This memorandum aims to show this Court that and hopes this Court will not, like the Government, ignore it. He hopes

that this Court will recognize that punishing him through a sentence of incarceration will do nothing to change him or serve any of the goals of punishment.

## I.    Coming Up from Rags and Helping Others Do the Same: The History and Characteristics of Brady Knowlton

Although the Government wants to highlight Brady's wealth to imply some entitlement or superiority complex, unlike the former President who encouraged him to come to Washington, D.C., Brady was not born with a silver spoon in his mouth. He came from humble beginnings that taught him to treat people with care and kindness and work hard to succeed in life.

As the PSR reflects, Brady was born in Joplin, far from a shining metropolis, and spent much of his time growing up in a rural, low-income community in Southwestern Missouri. His father, a funeral director, and his mother, a homemaker, moved from place to place several times as his father struggled to pay their rent and bills. As a testament to his meager and humble upbringing, Brady's nickname growing up was "Bucky." He earned that nickname because his mother, unable to adequately produce breast milk to feed him as an infant, was told by her doctor to drink a beer a day so that the yeast in it would help her produce milk. The beer Brady's father purchased for her to drink was Buckhorn Beer which only cost him a couple dollars for a six-pack. Those Buckhorns that his mother consumed was what led to the nickname, "Bucky."

Despite the humor behind his nickname, Brady's upbringing was not all laughter and joy. In addition to the financial hardships leading their family to move from place to place, Brady also suffered from the tragedy of being repeatedly sexually

abused by a mentally ill relative as an adolescent. He and his family had to go through extensive counseling to deal with the trauma inflicted by the experience. But Brady worked to recover from it and move forward with his life.

Eventually, Brady and his family moved to the Dallas area after his father found work there. Over his teenage years and into young adulthood, Brady's father's hard work finally paid off when he got into the oil business and began purchasing older, unprofitable oil wells and improving them to successfully produce and sell oil. Despite the financial success that benefited his father, Brady still made it a point to make a name for himself and not just rely on his father's good fortune and hard work.

After graduating from high school in 1998, he worked as a personal trainer and attended local college part time until enrolling in Southern Methodist University in Dallas. There, he earned his bachelor's degree in business management and graduated in 2003, earning the Entrepreneurship and Business Strategy Award.

He then formed and started his own company, Monarch Financial, Inc., with one of his best friends. Together, they began "dialing for dollars," looking for investors to help raise money for college endowment funds and insurance companies. Brady proudly got 12 yeses out of over 1600 no's from different companies and individuals that he tried to convince to invest in his company. Through perseverance, he raised enough money and then, like his father, branched out into buying oil and gas assets in East Texas.

While Brady took pride in his success in his business, he nevertheless felt the need to help people that were just like him and his family growing up. In 2010, he

connected with Jason Ybarra, a young man who, like Brady, also had grown up in a low-income neighborhood and worked hard to rise above his meager and humble up-bringing. With his help, Brady and Jason started a minority owned business, TexCap Financial, to advise, counsel, and assist Hispanic business owners with various types of businesses.

As more and more opportunities came to help minority business owners, Brady jumped right in and dedicated himself. In 2015, while in Mexico, he met a local fisherman who wanted to start a restaurant. Brady provided the necessary capital and business acumen to help him get started and worked closely to grow the business such that they expanded to additional locations. In 2020, he joined with other business owners of various minority backgrounds to establish Rambo Software to develop software for Spanish-speaking businesses to manage taxes, insurances, and warranties.



*Brady with Maasai tribal leaders*

Everywhere he went, Brady made an effort to connect with people and figure out a way to help them. On a trip to Africa, he met a tribe of Maasai people who grew fondly of him and his then-wife, Shelley. They held a tribal wedding for them and ultimately made Brady a member of their tribe. Brady subsequently contributed to having a large food shelter constructed to address severe food spoilage the tribe was suffering from. He then returned the following year to sponsor

a medical mission with a doctor providing much-needed treatment to severely ill tribe members and orphans. He also sponsored and helped repair a septic tank at the tribe's orphanage.

 

*Brady with Dr. Jeff Butterfield and Maasai tribe members and Dr. Butterfield treating a Maasai woman*

In 2010, after seeing American soldiers return from battles in the middle East with horrific injuries, Brady decided to reach out to the Wounded Warrior Project to find wounded veterans in need of assistance. He met two, Tyler Sloane and Alex Leonard, and quickly bonded with them. He would take them fishing, hunting, and on an African safari trip. In 2017, he started volunteering at a homeless shelter in Dallas, The Bridge, helping them with intake and providing services to the multitude of people who came through there.



*Brady with Wounded Warrior veterans, Tyler Sloane and Alex Leonard*

That same year, he also became involved in Dallas CASA (Court Appointed Special Advocates), an organization that helps child victims of abuse and neglect

and one that was very important to him given his experience of having been a victim of sexual abuse at a young age. He went through the training program and was assigned to a young man who he took under his wing and helped through the system. He spent time with him, even taking him on a college tour, and spoke on his behalf before a judge when he was charged with a juvenile offense. The young man eventually enrolled in college. It was through Brady's work with him and other chil-



*Brady after receiving the CASA Training Certificate*

dren going through the legal system that fortified Brady's passion to pursue his legal education.

Hence, in 2018, he applied to and enrolled in the University of Denver's Sturm College of Law flying back and forth between Utah and Colorado to attend the part time weekend program. Because of his work through CASA, he decided to work as an intern with Utah Legal Services in his home state to provide pro bono legal assistance to victims of domestic violence. He also worked with the Graff Law Firm in St. George, Utah, providing pro bono and low fee services to disadvantaged members of his community.

Brady's ambitions in the legal field were to continue his service to underprivileged communities. He wanted to continue to provide pro bono legal services to low-income families, minority-owned businesses, and the wrongly accused. He also

wanted to serve as an advocate for diversity in the capital markets, believing that minorities must have higher credit scores than non-minorities to obtain access to the same types of loans and lines of credit. Unfortunately, Brady's legal education and career came to a halt when he was suspended due to his arrest and charges in this case.

Brady, however, did not cease his efforts to empower minority entrepreneurs despite being in the midst of financial and legal troubles. In 2023, he met a dynamic native Turks and Caicos islander that could not find financing for his rental car business. Brady financed the entire business because he believed that every talented individual willing to work deserves the opportunity to improve their life regardless of their background.

In sum, Brady has spent much of his adult life working to help others, especially those who, like him growing up, suffered from abuse and lacked adequate resources to live a comfortable life. He hopes to continue doing so again, not having his actions on January 6 define him or change any of that.

## II.    A Dedicated and Loving Father

As dedicated and committed as Brady has been to helping others, it pales in comparison to the love and support he has shown and provided for his own children. Just as he has been driven by a desire to help those who, like himself, grew up less fortunate than others, Brady has strived to give his children an upbringing different from his own. Unfortunately, his children's experience has not been without difficulty or tragedy.

Brady's first-born child is his daughter, A.K. Although a beautiful, sweet, and amazing child, early on in her life, Brady recognized issues in her development. Doctors diagnosed her as having autism spectrum disorder. As she grew older, her diagnostic impressions changed with her exhibiting symptoms more consistent with schizophrenia spectrum disorder.

As attested to by a psychologist who worked with Brady and A.K. over several years, Brady has always been central to her care and treatment *See* EXHIBIT B. As stated in his attached letter, Brady consulted with him "throughout the process of gaining treatment for his daughter and her treatment and success was always his utmost concern."

As the PSR reflects, Brady previously lived in Dammeron Valley, Utah, a suburb of St. George, and was living there when he surrendered himself in the District of Utah on the charges in this case. What the PSR does not reflect, however, is *why* Brady was living there. As a true testament to Brady's dedication to caring for A.K., after being unable to find a clinical educational environment that could adequately care for her in Texas with her condition, Brady began searching around the country looking for the best schools for children with autism spectrum disorders. He finally found it in St. George at the Utah Behavioral Services' UTBS Academy. He purchased a home there for him and his children and relocated there so he could be present and as involved as possible with her education, development, and treatment.

A.K.'s educational experience there in Utah was going well until late 2022

when her treatment team at Utah Behavior Services recommended further interven-
tion to deal with her thought and mood disorders. This led Brady to have to make the
difficult decision to have A.K. placed in a residential treatment facility in early 2023.
It was one of the most difficult decisions Brady had to make in his life but made it a
point to stay connected and involved with her treatment.

But the separation was taking its toll on Brady, A.K., and his son and so, ear-
lier this year, Brady moved back to Texas and helped set up a treatment plan for A.K.
there. Although things were good at first, A.K. began presenting frightening suicidal
ideations and returned for a brief period to clinical treatment. A.K. is set to return
home to live with Brady within the next week and his involvement in and attention
to her life are of absolute importance as she continues to learn how to adapt and grow.

In addition to the love, support, and tremendous amount of attention Brady
has given to A.K., he has also strived to give the same to his son, G.K. Now 12 years
old, G.K. has looked up to and admired his father his entire life. He felt inspired to
be bilingual like his father. After years of self-dedication to his studies, G.K. not only
speaks conversational Spanish, he also speaks Mandarin at near fluency.

Although G.K. did not have the same difficulties in his childhood as A.K., trag-
edy struck him last year. While still living in Utah, G.K.'s older best friend who he
looked up to became involved in an incident with G.K.'s stepmother, Brady's now ex-
wife, Rebekka Feith. G.K. learned that she was engaged in a secret sexual relation-
ship with his friend, an underage minor. G.K. felt his life shatter. G.K. was a happy
child and boasted all A's in school. The woman he called "Mom" was the only mother

he had ever known. He was as close as a mother and child could be and yet she had committed an unspeakable betrayal. His parents divorced and the emotional trauma wrecked his heart, grades, and emotions. He spent a year in anguish and refused to socialize. Despite suffering an event no child should endure, G.K. is recovering. With the help of his father and therapists, G.K. has returned to successful academic performance and resumed activities with new friends.

The reality is, considering all the circumstances they have endured, at ages 12 and 13, in the height of their emotional and psychological development, Brady's children need him present in their lives. As the PSR reflects, there are no other legal guardians or parents involved to support or care for them. Despite the Government's extremely off-handed suggestion that Brady could "afford to pay a significant amount of money for high-quality care of his children," or have his parents or brother serve as custodian for both children, none can provide the necessary emotional support, guidance, and protection that only Brady can provide for them. As Dr. Lackey has stated, "[Brady] remaining in [A.K.'s] life to aid, support and champion her success and assisting in providing her opportunities for the greatest quality of life is paramount."[3]

---

[3] Recognizing the importance of having a single parent available to raise their children, Amendment 799 amended USSG §1B1.13 to allow for a reduction in a term of imprisonment when a court determine that extraordinary and compelling reasons warrant the reduction. More specifically, Section (b)(3) of that Guideline considers such a reason to be when circumstances result in the defendant being the only available caregiver for the defendant's minor children. USSG §1B1.13 (b)(3)(A)–(D).

### III.    The Most Liberal Republican You'll Ever Meet and Brady's Views Leading Up to January 6

When Brady was first asked by his counsel what his political affiliation was, he replied, "I'm the most liberal Republican you'll ever meet, and a disgruntled one at that." Although he has always firmly believed in Republican tax, economic, and military policies, he had become disgruntled with their social policies.

He was not an ardent supporter Donald Trump when he ran for President in 2016. He recalls never having donated to his campaign. He never proudly displayed Trump hats, flags, or other regalia. He attended only one rally that Trump held in Dallas when he ran for office in 2016.

But, as the COVID-19 pandemic crushed his business, distraught and depressed, Brady began to have concerns about the changing of voting laws on the heels of a global pandemic that shutdown our society in unprecedented ways. He did not watch a lot of television but started to view conservative websites like the Drudge Report, Breitbart, and the Gateway Pundit to obtain his news. Reading from these sources, his faith in the 2020 election began to wane.

After the election in November 2020, he wanted to see legislators use their power of inquiry to investigate and determine whether the election was undermined by any foreign actors. When Trump called for supporters to come to Washington on January 6 to "stop the steal," Brady felt an obligation to be there to let his voice be heard. He came hoping that, by joining with others and uniting to protest like others had done for other causes, Congress would have paused the certification and further investigated to confirm whether the election results were indeed valid.

Brady had no ideas or intentions of "storming the Capitol" or even going inside that building prior to January 6. He was, like many others who were relying on conservative websites, concerned for his own safety and the danger posed, not by Capitol Police, but counter-protestors. He had close friends who were in Las Vegas when a lone gunman opened fire on October 1, 2017 at the Route 91 Harvest Music Festival and saw the tragic loss of multiple lives caused by one lunatic. He had also witnessed a shooting at a gathering in a high school parking lot as a teenager. These experiences led Brady to be genuinely scared of something like that happening at Trump's rally at the Ellipse and hence, explains why he was wearing a flak jacket that day.[4]

As he began telling friends and families of his desire to come to Washinton, D.C., he learned that Patrick Montgomery and another friend, Bailey Jones, wanted to come as well and, as part of his usual generosity, Brady made travel arrangements for all of them.

When they arrived in Washington on January 5 and checked into the Yours Truly hotel where they spent the night, they had no idea of what to expect the following day.

## IV.    The Events of January 6 and Brady's <u>Undisputed</u> Unlawful Entry into the Capitol

That morning, Brady arrived at the Ellipse along with Patrick Montgomery, Gary Wilson, and others including Bailey Jones in time to hear then-President Trump speak. As he concluded his speech, Brady and the others began following the crowds

---

[4] It should go without saying that the attempted assassination of Trump in July 2024 at a rally near Butler, Pennsylvania is proof positive that Brady's belief was not entirely unfounded.

walking down Pennsylvania Avenue toward the Capitol. They were not yelling, "acting aggressively or highly confrontational," or even preparing to do the same.

As they drew closer to the Capitol, they saw thousands of others who were already present. At one point, one of Brady's friends mentioned hearing a cannon go off and questioning its purpose. But the scene was still relatively calm compared to what would take place as the hour got closer to 2:00 p.m. As they continued moving forward toward the Capitol Building, there were no visible signs that any of them were in the restricted area as designated by the Capitol Police. More notably, Brady and his companions were not shouting or acting in an aggressive manner compared to what would later be seen when confronted by Metropolitan Police.

As Brady describes in his letter to the Court, watching his actions captured on the Metropolitan Police officer's body-worn cameras was sickening to him. Sickening because he morphed into a calm, curious, concerned individual into a version of himself that he never expected to become.

As this Court recognized — and Brady stipulated to for his bench trial — Brady knew at *that time* that access to the Capitol Building was typically restricted in some capacity. *See* ECF Dkt. 233 at 15, ¶35. As he began ascending the steps under the scaffolding and looked down from the Upper West Terrace, that intuition indeed grew stronger.

The Government insists that Brady should not receive credit for accepting responsibility for his unlawful entry into a restricted area because his counsel "disputed [ ] his conduct," arguing that "because he did not break down a door or push a police

officer, and because no police officer explicitly told him that he was not allowed inside,
he lacked intent to enter someplace he was not allowed to enter." Government Sen-
tencing Memorandum ("Govt. Memo"), ECF Dkt. 269 at 14. That is a blatant misrep-
resentation of the record. Here is exactly what counsel argued and, more importantly,
what the truth of the matter was:

> Now, we are **not** trying to maintain that entry was clearly allowed at
> this point, but we are showing this to the Court for a very important
> reason. This is a very stark contrast to other scenes that were captured
> on that day where individuals were pushing through, breaking doors,
> breaking glasses, pushing police officers over.
>
> There is no indication in this video or in the stipulated evidence that Mr.
> Montgomery, Mr. Wilson, Mr. Knowlton were told at this point, do not
> enter, go back, turn around, anything else like that.
>
> ***
>
> ***And, again, this is not to say that their entry was permitted***.
> Again, we have stipulated that he was entering the area. But, again, the
> issue here is whether there is some corrupt obstruction. And I think it
> is relevant for the Court to consider the interactions that Mr. Knowlton
> and Mr. Wilson and Mr. Montgomery are having with officers as they
> are moving through the building.

Transcript of Bench Trial, ECF Dkt. 231 at 47–48 (emphasis added). The entire pur-
pose of that argument — and the YouTube video that the Government submitted as
an exhibit to their sentencing memorandum — was only to, as argued at the bench
trial, establish that Brady's entry through the Upper West Terrace doors was indeed
"a very stark contrast to other scenes that were captured on that day" where individ-
uals who were arguably acting with a depraved and evil purpose "were pushing

through, breaking doors, breaking glasses, pushing police officers over."[5]

As Brady moved through the building, however, and he saw others "pushing police officers over," it became abundantly clear in his mind that his presence inside the Capitol was unlawful. Yet, as the stipulated evidence admitted as his trial showed, Brady continued to move through the Capitol ultimately confronting police officers outside of the Senate Minority Leader's office until his better sense told him to leave.

## V.    The Aftermath of January 6 for Brady Knowlton

As pointed out at his bench trial, immediately after departing the Capitol building and grounds, although Brady did not brag nor boast about his conduct on social media or to others, he knew that he made a terrible decision. What he did not know at the time were the incredible consequences that would befall him over the following days, months, and years.

After he was charged and peacefully surrendered to authorities, and the same was publicized in the media, one of the first punitive consequences to occur was Brady's suspension from law school. Considered to be a violation of the student Code of Conduct, the school took immediate action to remove him from all classes and pro-hibit him from going on campus premises based on his alleged actions at the Capitol. His law degree was withheld from him despite finishing all the required courses.

---

[5] The video was created and posted to YouTube to counteract videos that were constantly published in the media showing protestors pushing through, breaking doors, breaking glasses, and pushing po-lice officers over. As discussed *supra* and *infra*, Brady had lost millions of dollars from investors after January 6 who saw what was being constantly published and he needed something to publicly show that his entry was without violence or damage and done in stark contrast to others that day.

Brady's economic troubles from the COVID-19 pandemic were then amplified due to his indictment. He had to close a merchant services business due to the pandemic and started 2021 with a loss of $250,000 he provided as operating capital. After his arrest, he could no longer represent the auto-lending company or get responses from his financing network. He was told that they could not give a loan to a "felon associated with an insurrection." Without financing, the company crumbled. Brady lost $740,957 in personal loans to the business. He owes $840,000 for the only outside financing he could secure. He lost his $325,000 initial investment.

The software company he invested in suffered a similar fate. Brady could not get his banking contacts to return his calls. He lost $650,000 in investments to that business. Morgan Stanley refused to allow Brady to even open an investment account since he was arrested for "insurrection." In total, Brady has lost over $2,500,000 since his arrest.

Then, as discussed *supra*, his marriage ended in one of most tragic and unsettling ways when he and his son discovered his ex-wife engaged in an illegal sexual relationship with his son's best friend. He struggles to this day to care for and provide for his children so that they may lead a normal, productive life, while trying to recover from the trauma and experience of dealing with his ex-wife's adulterous and illegal acts.

## VI.    This Court's Sentencing Decisions

It now falls upon this Court to decide an appropriate sentence for Brady's actions on January 6, an end to this sad and sickening chapter in Brady's life. As he pointed out at the beginning of this memorandum, punishing him through a sentence

of incarceration will do little to change him or serve any of the goals of punishment.
The appropriate sentence in this case, given all his circumstances, is a sentence of
probation with home detention.

### A. Sentencing Guidelines Application

Brady concurs with the Government and the Probation Office's position that
USSG § 2B2.3 is the most appropriate guideline applicable to his conviction for vio-
lating 18 U.S.C. § 1752(a)(1). *See* Govt. Memo, ECF Dkt. 269 at 13; PSR at 12, ¶ 50.
Thus, the Base Offense Level is a 4.

He further concurs that the Special Offense Characteristic set out in USSG §
2B2.3(b)(1)(A)(vii) applies to his case as the trespass occurred "at any restricted build-
ing or grounds." *See* Govt. Memo, ECF Dkt. 269 at 13; PSR at 12, ¶ 51. Accordingly,
2 levels should be added to the Base Offense Level for a total of 6 points.

Finally, he unequivocally concurs with the Probation Office's recognition that
no departures from the Guidelines are warranted but, more importantly, that a var-
iance may be warranted from the applicable guideline range due to Brady being the
sole caregiver for his minor children, one of which requires special care. PSR at 26,
¶¶ 152, 154.

Where he disputes both the Government and the Probation Office's positions
is whether (a) he should receive a 2-level reduction for acceptance of responsibility
under USSG § 3E1.1 and (b) whether he is eligible for the zero-point offender reduc-
tion of 2 levels under USSG § 4C1.1. *See* Govt. Memo, ECF Dkt. 269 at 14–15; PSR
at 12, ¶ 50. Upon receiving both of those adjustments, Brady maintains that his Total
Offense Level should be a 2.

### 1.  Acceptance of Responsibility

Brady nor his counsel have ever disputed to this Court that his entry into the restricted area was unlawful and done knowingly.

At his bench trial, Brady entered into a stipulation of evidence and conceded that, as for the violation of 18 U.S.C. § 1752(a)(1) alleged in Count Five, "if the Court finds the existence of these facts beyond a reasonable doubt, this evidence would establish each and every element" of that offense. ECF Dkt. 233 at 23, ¶53. After the Government rested its case, he presented no evidence to challenge or contradict that evidence or argument to challenge his conviction on that count. *See* Transcript of Bench Trial, ECF Dkt. 231 at 34. In sum, he "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] [nor] falsely den[ied] any additional relevant conduct." *See* USSG § 3E1.1, cmt. 1(A).

Although Brady has taken issue with his prosecution for violating 18 U.S.C. § 1512(c)(2), this Court should not take his positions relative to that charge to mean that he should not be held accountable or responsible for his actions of January 6. This Court should, pursuant to USSG § 3E1.1, reduce Brady's offense level by 2 levels for acceptance of responsibility.

### 2.  Zero Point Offender

Although the Probation Office originally concluded in their Pre-Plea Guideline and Criminal History Calculation memorandum that Brady met the criteria set out in USSG §§ 4C1.1(a)(1) – (10) and, thus, was entitled to a two-level reduction in his offense level, *see* ECF Dkt. 209 at 5, as the Probation Office and Government pres-

ently maintain, Brady does not qualify for the adjustment "because he created a cred-ible threat of violence in connection with the offense." *See* Govt. Memo, ECF Dkt. [269](#) at 15–16; PSR at 12, ¶ 57. More specifically, the PSR points out in that same para-graph that he "yelled and was aggressive and combative towards the law enforcement officers"; "questioned them regarding their oaths and on at least one occasion he made a jabbing motion with his finger, almost touching an officer as he asked the officer to step aside." *Id.*

Although "[n]either § 4C1.1 nor other provisions in the Guidelines define the terms 'use violence' or 'use ... credible threats of violence' [a]nd the D.C. Circuit has not interpreted these terms as used here," several other judges in this District have considered and analyzed how those terms should be interpreted and applied in the context of various cases involving individuals convicted for conduct at the Capitol on January 6. *United States v. Yang*, No. 23-cr-100-JDB, 2024 WL 519962, at *3 (D.D.C. Feb. 9, 2024); *see also United States v. Williams*, No. 21-cr-618-ABJ, 2024 WL 1239989, at *2–3 (D.D.C. Mar. 22, 2024) (citing *United States v. Hernandez*, No. 21-cr-445-CKK (D.D.C. Jan. 31, 2024) (ECF No. 65); *United States v. Bauer*, No. 21-cr-386-2-TNM (D.D.C. May 31, 2023) (ECF No. 187); *United States v. Dillard*, No. 23-cr-49-JMC (D.D.C Nov. 30, 2023) (ECF No. 43)); *United States v. Kelly*, No. 21-cr-708-RCL-1, 2024 WL 756642, at *7 (D.D.C. Feb. 23, 2024).

Several judges have looked to the plain meaning of those terms, considered their various legal definitions, and noted that all of them incorporate the use of "phys-

ical force." *See Williams*, 2024 WL 1239989, at *2 (citing *Violence*, BLACK'S LAW DIC-
TIONARY (11th ed. 2019); *Violence*, Oxford English Dictionary, https://www.oed.
com/dictionary/violence_n?tl=true (last visited Mar. 18, 2024); V*iolence*, Merriam-
Webster Dictionary, https://www.merriam-webster.com/dictionary/violence (last vis-
ited Mar. 18, 2024)); *Yang*, 2024 WL 519962, at *4 (citing the same); *Kelly*, 2024 WL
756642, at *7. As this Court itself noted, however, Brady "did not actually, himself,
engage in any physical violence that day." *See* Transcript of Bench Trial, ECF Dkt.
231 at 30. Accordingly, the only remaining question is whether Brady made a "credi-
ble threat of violence." *See* USSG § 4C1.1(a)(3).

As Judge Bates pointed out in his decision in *United States v. Yang*, "a 'credible'
threat is one that 'offer[s] reasonable grounds for being believed or trusted.'" *Yang*,
2024 WL 519962 at *4 (quoting *Credible*, Merriam Webster Dictionary, https://www.
merriam-webster.com/dictionary/credible). Judge McFadden further considered that
a "'threat' is defined as 'an expression of an intention to inflict evil, injury, or damage
on another,' . . . or as 'a declaration, express or implied, of an intent to inflict loss or
pain on another.'" *United States v. Bauer*, 714 F. Supp. 3d 1, 6 (D.D.C. 2024). "Com-
bining these definitions," he concluded that "a 'credible threat of violence' is a believ-
able expression of an intention to use physical force to inflict harm." *Id.* Additionally,
as he further correctly noted, courts are to look to "contextual evidence" to determine
whether such a threat was credible. *Id.* (citing *United States v. Johnson*, 64 F.4th
1348, 1352 (D.C. Cir. 2023)).

When considering the entire context of Brady's actions, although he "yelled"

and was "aggressive" toward Officer B.M., there was nothing to suggest that he acted with any intent to use physical force to inflict harm on him or any other officers. The entirely of his actions at the Capitol, in fact, confirm the same.

Despite Mr. Montgomery's actual use of physical force against Officer D.H. outside of the Capitol building, Brady never once placed his hands on any officers or threatened to use any force against any of the officers. *See* Stipulated Trial Exhibit 1.

Upon entering the Capitol building, as this Court will recall, Capitol Police officers stood by as Brady and others entered. Again, Brady made no threats towards the officers nor exhibited any intent to inflict harm on them. *See* Stipulated Trial Exhibits 11 & 12.

When Brady and others made their way toward the hallway outside of the Senate Gallery, although he witnessed others using physical force and violence against officers guarding the Gallery doors, Brady backed away, stood there calmly and again, made no contact with those officers nor can be heard making any threats toward them. *See* Stipulated Trial Exhibit 16.

After coming back downstairs, walking through the Ohio Clock Corridor, and seeing officers allowing Jacob Chansley in his now-infamous "horns" to pass by them and walk back upstairs toward the Senate Gallery, *see* Stipulated Trial Exhibit 13, Brady and others were stopped by Officer B.M. and other officers near the Senate Minority Leader's office. *See* Stipulated Trial Exhibit 10.

At this point, as this Court found, Brady was indeed "angry and aggressive in

his interaction with Officer B.M." *See* Transcript of Bench Trial, ECF Dkt. 231 at 13. However, Brady never explicitly threatened to inflict harm on Officer B.M. or any of the officers, telling them instead, "We are with you guys." *Id.* Although this Court took Brady's statement, "We don't want to push through here," as presumably an implied "threat of what he was prepared to do," *id.* at 31, entirely absent both explicitly and implicitly in Brady's words or actions is anything demonstrating an intent to inflict actual harm on Officer B.M. or other officers. What followed thereafter merits consideration as well.

First, as the parties stipulated and was reflected in Stipulated Exhibits 8, 9, and 10, Brady, Mr. Montgomery, and Mr. Wilson "eventually left the area once there was increased police presence, and because it was clear that [officers] were not going to let them through into the Senate Chamber." ECF Dkt. 233 at 21, ¶49.j. In other words, instead of continuing to escalate the situation and thus create an actual possibility of violence, Brady chose to walk away.

Brady thereafter made no attempts to make further entry into the Capitol Building. Instead, as this Court recognized, Brady and Mr. Montgomery spoke with two officers who assisted in directing them how to leave the building. *See* Transcript of Bench Trial, ECF Dkt. 231 at 13. Brady displayed no aggression or threats of violence toward those officers. *See* Stipulated Trial Exhibit 14.

Finally, as reflected in Stipulated Exhibit 15, Brady peacefully exited the building through the Senate Carriage Door, giving one officer a friendly "elbow bump" and then giving friendly pats on the shoulder to another officer standing immediately

inside the Senate Carriage Door and another standing immediately outside the door. *See* Stipulated Trial Exhibit 15.

In sum, the contextual evidence overwhelmingly demonstrates that Brady did not intend to inflict harm on any officers, much less threaten them with physical harm.

Based on 4C1.1(a)(3)'s mandate to "consider [ ] individualized conduct when assessing whether a defendant is entitled to a two-level reduction in offense level," *Yang*, 2024 WL 519962 at *6, because Brady, in fact, did not demonstrate a believable expression of an intention to use physical force to inflict harm, he should receive the two-level reduction provided for by 4C1.1.

### B. Additional PSR Objections/Corrections

Brady takes serious issue with the representations in Part C of the PSR that the information contained therein "remains unverified" as he "did not return signed release forms provided by the Probation Office." PSR at 14, fn. 3.

On April 5, 2024, undersigned counsel emailed Aidee Gavito, the officer assigned to conduct Brady's presentence investigation, the completed Worksheet for Presentence Report (PROB 1), Net Worth Statement (PROB 48), Monthly Cash Flow Statement (PROB 48B), as well as a signed and executed Authorization to Release Information and Customer Consent and Authorization for Access to Financial Records for Presentence Report. *See* EXHIBIT C.

After the initial draft of the PSR was issued on May 28, 2024, undersigned counsel again emailed the signed release forms to Ms. Gavito, pointing out that they were attached to the email to her on April 4, 2024.

This email was one of seven emails that were sent to Ms. Gavito with all the information she requested as part of her presentence investigation (and more that she did not request). For the PSR to reflect that Brady "did not return signed release forms provided by the Probation Office" implying that he did not cooperate with the presentence investigation could not be farther from the truth.

This same concern also extends to the PSR's reference to communication with Brady's brother which, according to the PSR, "was attempted on multiple occasions but was not established." PSR at 14, ¶70. During the PSR interview on April 15, 2024, Brady provided Ms. Gavito contact information for his brother, Corey Knowlton, and informed her that he was prepared for her to contact him to verify the details related to Brady's personal and family history. On June 11, 2024, undersigned counsel emailed Ms. Gavito with a list of non-substantive changes and corrections to the PSR and specifically asked to "confirm that you were able to connect with his brother, Corey, to verify the personal and family data." *See* EXHIBIT D. Undersigned counsel never received a response.

Corey Knowlton has always been and continues to be willing to speak with anyone from the Probation Office to confirm all the information Brady has provided.[6]

---

[6] As Ms. Gavito is on family leave until next year, undersigned counsel reached out to Kelli Willett, a supervisor with the Probation Office on November 19, 2024 by email to point out this continued desire of Corey Knowlton to speak with a probation officer, providing her with his cell phone number and offering to have him reach out and call a Probation Office representative to confirm all the necessary details. Ms. Willett replied the following day informing undersigned counsel that although Ms. Gavito was "generally very diligent," she was "sure it was just an oversight," and we could point out these "representation[s] at sentencing." However, she further informed counsel the final PSR could not be changed without further order from this Court.

In sum, Brady does not want this Court to think in any way that he has failed to cooperate with the presentence investigation or has impeded Ms. Gavito or anyone else from the Probation Office from doing their job when, the truth is, he and his counsel have gone above and beyond to provide her and their office with everything needed for a full and fair presentence investigation.

## C. Application of the Section 3553 Factors

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

This Court is acutely aware of the nature and circumstances of the offense having reviewed all the stipulated evidence at the bench trial in this case. Brady has pointed out all that should be considered in relation to the offense including the lack of violence, destruction, or forceful entry into the Capitol building, as well as the lack of action before and after his unlawful entry demonstrating a calculated intent to commit a crime or take pride in his action at the Capitol.

In its sentencing memorandum, the Government repeatedly points to generally how Brady "participated in the . . . attack on the United State Capitol — a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred," Govt. Memo, ECF Dkt. 269 at 1, how he "was among the rioters who forced the Senate to evacuate its chamber," *id.* at 2, and how his conduct "like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm the police, breach the

Capitol, and disrupt the proceedings." *Id* The Government continues with how "[h]e joined a mob that threatened the lives of legislators and their staff." *Id*. at 16.

In doing so, however, the Government does exactly what the USA Today article discussed *supra* concluded and fails to consider additional information to put Brady's actions into context. It looks at the actions of those engaged in truly riotous and violent behavior and imports them entirely onto Brady.

As this Court noted, Brady did not engage in violence much unlike others who did so as part of a violent attack on officers. He did not force his way across barricades or through police lines. He did not injure anyone. He did not break down any doors to enter the Capitol. More importantly, he did not direct, aid, or encourage others to do any of those acts.

When he entered through the Upper West Terrace door, he saw officers standing by and made no effort to confront or harass them. When police officers made their first visible attempt to stop him outside of the Senate Minority Leader's office, although he tried to convince them to let him and others through, when they made their stand and refused to let him pass, he complied with their commands without as much as a shove and made his way to exit the building. When he did exit the building, instead of "overwhelming the police," he thanked them and respectfully patted them on the shoulder.

Additionally, Brady himself did not directly threaten the peaceful transfer of power nor intended to prevent the peaceful transfer of power. As discussed *supra*, he wanted legislators to use their power of inquiry to investigate and determine whether

the election was compromised. By showing his support, he hoped the members of Congress would have paused the certification and further investigated to confirm whether the election results were indeed valid. He never intended to destroy the process of transferring power peacefully. He simply wanted it to be done, based on his beliefs, correctly. Of course, by the time Brady entered the Capitol building, the proceedings in both chambers had already been adjourned. *See* ECF Dkt. 233 at 5, ¶7; at 14, ¶34 (chambers evacuated and proceedings suspended at 2:20 p.m.; Brady's entry occurred at 2:35 p.m.). In short, to say that Brady was responsible for disrupting the proceedings requires inference upon inference upon inference. To further say that he threatened the lives of legislators and their staff is just entirely absurd.

Beyond the nature and circumstances of the offense, however, this Court must also weigh that against his history and characteristics as discussed *supra*. It cannot be ignored that Brady is not an agitator. He is a facilitator. He is not a destroyer. He is a builder. He is not selfish. He has spent his entire life unselfishly helping others.

Attached as EXHIBIT E are several letters from various individuals who have known Brady, seen and benefited from his good deeds, and can attest to his positive character.

More importantly, also attached as EXHIBIT A is a detailed letter from Brady expressing his remorse and shame over his actions on January 6. It gives this Court an accurate and poignant picture of his life before and after that date.

In sum, he is not someone who acts with depravity or evilness in his heart. He has spent his entire life working to help others. He has devoted himself to the care of

his children. He has dedicated himself to lifting people up and supporting them, not tearing them down. His history and characteristics, quite simply, strongly outweigh the nature and circumstances of his offense and weigh strongly against a sentence of incarceration.

### 2. The Need for the Sentence Imposed — to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense;

The seriousness of the offense Brady was convicted of, like the nature and circumstances of the offense discussed above, also requires context. As a whole, the events of January 6 were undoubtedly serious and, as this Court put it, a stain on the history of this nation. Watching officers pushing with all their might to keep protestors from entering through doors while being pummeled with flag poles and other weapons was abhorrent. Seeing protestors break and climb through windows shocked the conscience. Knowing that officers and protestors were injured and ultimately died only adds to the sad and tragic nature of the events of that day.

But, again, Brady did not push past any barricades or use any physical force to break through police lines. He did not break any windows or doors or even go through an entrance that appeared to have been broken in any way. Instead of a violent confrontation with officers as seen at other entrances to the Capitol, Brady entered with hundreds of others with officers standing by putting up no resistance. Undoubtedly, he saw others at multiple points both outside and inside the Capitol engaged in physical confrontations with police and security officials. But every time, he backed away or kept his distance making no attempt to involve himself in any situation where others were possibly injured.

Brady was convicted of unlawful entering a restricted building or grounds because that was the worst thing that he did. Three things provide an appropriate "measuring stick" for how serious this Court should view this offense.

The first is the Sentencing Guidelines which the Government concedes are to be given "respectful consideration" in light of the extensive work that the Sentencing Commission puts into formulating them. *See* Govt. Memo, ECF Dkt. 269 at 28 (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)). Section 2B2.3 treats trespass as a comparatively minor offense by providing for a base offense level of 4. *See* USSG § 2B2.3(a). It then accounts for the more "serious" factor that Brady's trespass occurred in a restricted area, namely, the Capitol building where the Vice President was temporarily visiting, by increasing the offense level by 2 levels. *See* USSG § 2B2.3(b)(1)(A). Even when the trespass occurs on a highly sensitive area like the White House or its grounds, or the Vice President's official residence or its grounds, the offense level is increased by only 4 levels. *See* USSG § 2B2.3(b)(1)(B). These specific offense characteristics demonstrate that Congress contemplated worse than average trespasses (which admittedly was what Brady did on January 6) and accepted a relatively small increase in the offense level as opposed to a much greater one.

Secondly, as this Court is aware, when it comes to the Capitol building itself, 40 U.S.C. § 5109 has limited the statutory maximum penalty for most unlawful activities taking place therein, absent those involving weapons, to six months. *See* 40 U.S.C. §§ 5104, 5109.

Third, and most notably, this Court cannot ignore the fact that despite the events of January 6, the President-Elect's contribution to what occurred that day at the Capitol, the involvement of his supporters in the "violent attack" on the building, and the President-Elect's promise to pardon many of those supporters, a majority of Americans nevertheless elected him to serve as President of the United States a second time in this most recent election. Although Trump's election in 2024 can be interpreted to mean many different things to many different people, the truth of the matter is that a majority of Americans were not so offended by what took place on January 6 to prevent him from being elected to a second term. That should speak volumes in terms of how serious Brady's offense of conviction should be seen. *See* 28 U.S.C. §§ 994(c)(4), (5) (noting offense may be more or less serious depending on "the community view of the gravity of the offense" or the "public concern generated by the offense.").

It should also impact how this Court views its sentence as promoting respect for the law. Brady undoubtedly should be held to account for his actions on January 6. While others have elected to contest their guilt to the various misdemeanor offenses related to the unlawful entry and presence in the Capitol building and grounds, Brady chose instead to proceed with a stipulated trial where he did not contest his guilt as to the unlawful entry charge alleged in Count Five. He did so out of a respect for the law that he has always had for his entire life, save for that fateful day on January 6.

A sentence of incarceration is not going to change that for Brady. Brady, the people around him, and the people of this country are not going to look at a sentence

of incarceration in his case and have some epiphany where they suddenly respect the law more because he is incarcerated because of his actions. To the contrary, a sentence of incarceration in his case has the potential to have the opposite effect, furthering that belief discussed at the beginning of this memorandum that Brady is not being punished for his actions, but because of his political beliefs and his support for the "wrong candidate" for President.

The just punishment in Brady's case is a sentence of probation with home detention. It holds him accountable for his wrongdoing and provides a constant reminder to him that his actions have consequences.

### 3. — to Afford Adequate Deterrence to Criminal Conduct

While Section 3553(a)(2)(B) requires this Court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct," there is no evidence that a lengthy sentence reduces crime through deterrence. "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Michael Tonry, "Purposes and Functions of Sentencing, 24 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006).

The Government expresses grave concern about "the risk of another attack on the Capitol," necessitating a "significant sentence." Govt. Memo, ECF Dkt. 269 at 27. However, as recent history has shown, there is little cause for concern following the 2024 Election. "Election Day unfolded relatively smoothly as voters faced only scattered disruptions and delays after an election season marked by concerns over disinformation, foreign influence and threats to election workers and voting systems."

Christina A. Cassidy & Ali Swenson, Associated Press, "Election Day unfolds rela-
tively smoothly after massive turnout by early voters," PBS NEWS, Nov. 5, 2024.[7] This
was despite warnings from some experts of "a persistent threat" of political violence
"heading into the Nov. 5 elections." Michael Kunzelman, "Election threats persist four
years after far-right extremists stormed the US Capitol," AP NEWS, Oct. 28, 2024.[8]

Other experts have stated that there is "reason to believe a repeat of the Jan.
6 insurrection is unlikely." Brad Dress and Ellen Mitchell, "Why fears of post-election
violence may be inflated," THE HILL, Oct. 26, 2024.[9] Although this is due in part be-
cause of "stiff sentences for leaders of the Proud Boys and Oath Keepers [that] has
weakened the militia-style groups that helped orchestrate the Jan. 6 riots," other fac-
tors such as the designation of the certification proceedings as a National Special
Security Event and the fact that President Biden is unlikely to standby like then-
President Trump did in the face of political violence in 2020 also support that belief.
*Id.* Most notably, as Amy Cooter, an antigovernment extremist expert at the Center
on Terrorism, Extremism, and Counterterrorism of the Middlebury Institute, noted,
"the conditions for political violence appears lower than in late 2020, a particularly
tense year because of the George Floyd protests and coronavirus pandemic." *Id.*

---

[7] Available at https://www.pbs.org/newshour/politics/election-day-voting-unfolds-smoothly-with-scat-
tered-issues-and-delays.

[8] Available at https://apnews.com/article/capitol-riot-election-extremism-
88457e7bf02a908fa2716047fc370cc6.

[9] Available at https://thehill.com/policy/national-security/4951225-jan-6-threats-trump-rhetoric/.

The reality is that sentencing Brady to incarceration is going to have no deterrent effect whatsoever on anyone. It will have no general deterrent effect. More importantly, as explained hereafter, it will have no specific deterrent effect on him.

### 4. — to Protect the Public from Further Crimes of the Defendant;

This Court should have no doubt in its mind that Brady is never again going to engage in the aberrant behavior that he engaged in on January 6, much less any criminal activity for the remainder of his life. There are three items of empirical proof to support this.

First, as discussed *supra* and highlighted in his letter to the Court, Brady has not only lived a law-abiding life, never having been arrested in his entire life, he has been a positive, contributing member of society helping several businesses, volunteering to assist veterans, homeless individuals, troubled youth, and people all over the world.

Second, this case has been pending for close to four years. During this time, Brady has been subject to conditions of release which he has fully complied with. *See* PSR at 6–7, ¶¶ 18–20. When given multiple opportunities to travel abroad, he returned and complied with all this Court's instructions without nary a complaint or issue, demonstrating not only respect for the Court and the law, but also that he is not a danger to the public.

Third, this Court cannot ignore the enormity of the loss Brady has already endured as a result of his actions on January 6. From losing his wife due to her illegal affair with a minor, to being kicked out of law school, to losing millions of dollars in

his businesses, to the impact on his children who he is now left to raise on his own, these life-changing consequences have only fortified Brady's resolve to never engage in any illegal activity and find himself in a court of law facing criminal charges again.

A sentence of incarceration is unequivocally unnecessary to protect the public from further crimes by Brady.

     **5.  — to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner;**

Although this 3553 factor is ordinarily given little consideration (and is, in fact, entirely ignored by the Government in their sentencing memorandum), it bears consideration for an important reason here.

Brady obviously needs no further educational or vocational training, having graduated from Southern Methodist University with a degree in business management and having started and worked with multiple companies.

His physical health, however, has been recently compromised in a particularly sensitive manner requiring medical care. In July of this year, Brady received a disturbing medical diagnosis which he will disclose to this Court at his sentencing hearing.[10] Brady personally emailed Aidee Gavito on August 5 about this diagnosis, hoping that it would be included in the non-publicly filed final PSR, however, it was omitted from the report.[11]

---

[10] The Government is aware of this diagnosis having been previously provided with medical records related thereto.

[11] This email can be produced to the Court at the sentencing hearing, if needed.

At this time, Brady requests that this Court take notice of the existence of a significant medical issue and await any conclusions about the applicability of this 3553 factor until hearing the full extent of Brady's physical health condition. In sum, Brady anticipates this Court finding, based on this factor, that a sentence of incarceration is not only unnecessary, but potentially deleterious.

### 6. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct;

In terms of unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, there is only one case worth considering — one that Brady and his counsel brought to this Court's attention over three years ago as part of his complaint about the unmethodical use of Section 1512 (c)(2): *United States v. Anthony Mariotto*, 21-cr-94-RBW. *See* ECF 66 at 15.

As this Court may recall, Brady pointed to Mariotto's case because, like Brady, Mariotto had also entered the Senate Gallery after it had been evacuated. *See* Govt. Memo, ECF Dkt. 35 at 10. However, unlike Brady, he had not been charged with violating Section 1512(c)(2). *Id.* at 12. Instead, he was charged with the identical misdemeanors Brady was charged with in Counts Five through Nine. *Id.*

In its Sentencing Memorandum in Mariotto's case, the Government advocated that the court there, "in determining a fair and just sentence on this spectrum . . . look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant

destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. *Id.* at 13.

Let us use the Government's "factors" and look at Mariotto's conduct side-by-side with Brady's conduct:

| (1) *"whether, when, how the defendant entered the Capitol building"* ||
|---|---|
| **Mariotto** | **Brady** |
| "Recording the walk with his cell phone, the defendant approached the west side of the Capitol building and walked around a temporary police bike-rack type of barricade on the Capitol grounds. Still recording, when the defendant approached a fence line with a sign that read 'Area Closed,' as depicted in the screenshot . . . taken from a video he recorded, a voice consistent with the defendant's voice stated, 'area closed. Yeah, right.' He then walked around the fence and 'Area Closed' sign to join the crowd on the West Lawn." Memo at 3. | By the time Brady and the others arrived the west side of the Capitol, thousands were already present and Brady and the others were not seen walking around, over, or across any barricades or passing any signs that read "Area Closed" before arriving at the West Front of the Capitol. |
| "[T]he defendant made his way to the front of the mass of people, directly in front of the officers dressed in riot gear and armed with tear gas," and filmed them. Memo at 4. | Brady and the others were further back away from the front line but came into contact with Metropolitan Police Officers dressed in riot gear. Brady watched as Mr. Montgomery tried to take one of the officers' batons and then subsequently kick the officer before pulling him away. |
| "Still recording his progress, the defendant made his way up the stairs on the northwest side of the building, which was covered with scaffolding and tarps in preparation for the upcoming inauguration of President Biden. The defendant | Brady and the others made their way up the same stairs. There is no evidence of him shouting anything as he made his way up those stairs but others were "jeering loudly." |

| | |
|---|---|
| recorded the mob of people on the stairs, including people climbing the scaffolding. As he made his way up the stairs, a voice consistent with the defendant's stated 'no one is going to steal our fucking election.'" Memo at 5. | |
| Mariotto entered through the Senate Wing door "which had a visibly broken window and broken out windows on either side of it from the rioters that breached the windows and door approximately five minutes earlier – a voice consistent with the defendant's chanted 'Our House' as he walked through the door. Other rioters yelled 'welcome home, patriots,' and a voice consistent with the defendant's answered, 'that's right,' all while an alarm blared in the background and the defendant raised his fist in triumph." Memo at 5. | Brady and others entered through the Upper West Terrace Door that had been opened from the inside but not broken. It had a sign indicating it was an emergency exit only and alarms were sounding as Brady and several others entered. Once through those doors, they then entered a foyer where multiple Capitol police officers stood by and watched as Brady and the others entered and passed them. |

| (2) *"whether the defendant encouraged violence"* | |
|---|---|
| **Mariotto** | **Brady** |
| Upon arriving at the Crypt "just moments after United States Capitol Police (USCP) officers were forming a line to block the rioters," "[a]pparently observing this, a voice consistent with the defendant's yelled, 'yeah, like they're going to stop us.'" Memo at 6. | Brady made no statements encouraging violence. |

| (3) *"whether the defendant encouraged property destruction"* | |
|---|---|
| **Mariotto** | **Brady** |
| Although not indicative of encouraging property destruction, "Recording his journey, the defendant walked through hallways lined with what appeared to be offices chanting 'defend your liberty, defend your constitution' with a crowd of people. The defendant again attempted | Although not indicative of encouraging property destruction, as Brady walked down the hallway on the third floor towards the Senate Gallery, he proclaimed, "We have a right to choose our electors! We're not going to have communist China choose them for us! We're not going to have the Democratic Party choose them for us!" |

| to gain access to four closed, and apparently locked, doors located along the hallway." Memo at 9. | |
|---|---|

| **(4) *"the defendant's reaction to acts of violence or destruction"*** ||
|---|---|
| **Mariotto** | **Brady** |
| Mariotto was in the Crypt when the crowd rushed past officers and recorded their advance past the officers attempts to form and hold a line. Memo at 6–7. He then walked toward the Rotunda doors where he saw three USCP officers guarding the door and the door subsequently being breached and officers being assaulted. He videorecorded all these encounters. Memo at 8–9. | Brady and the others stood by as USCP officers tried to secure the Senate Gallery doors and watched as others assaulted them and prevented them from locking the doors. |

| **(5) *"whether during or after the riot, the defendant destroyed evidence"*** ||
|---|---|
| **Mariotto** | **Brady** |
| "The defendant deleted his Facebook account prior to the FBI learning about his conduct on January 6." Memo at 10. | No evidence Brady destroyed evidence during or after the riot. |

| | |
|---|---|
| **(6) *"the length of the defendant's time inside of the building, and exactly where the defendant traveled"*** ||
| **Mariotto** | **Brady** |
| After entering through the Senate Wing Door, Mariotto proceeded to the Crypt, then to the Rotunda Doors, then "moved even deeper into the Capitol to the third floor of the building," before entering the Senate Gallery, taking a "selfie," posting it to Facebook, and then leaving the building. "In total, the defendant spent approximately 20 minutes inside of the Capitol." Memo at 5–10. | After entering through the Upper West Terrace Doors, Brady moved to the third floor and entered the Senate Gallery. After leaving the Gallery, he proceeded down one floor to the Ohio Clock Corridor where, at the end of the hallway, he confronted Officer B.M. and others. After they were not permitted to pass, they followed officers' instructions on how to leave the building and departed through the Senate Carriage Doors. In total, Brady spent approximately 18 minutes inside of the Capitol. |

| (7) *"the defendant's statements in person or on social media"* | |
|---|---|
| **Mariotto** | **Brady** |
| "On January 23, 2021, the day after he was arrested, Anthony Mariotto gave an interview to his local news station. During that interview, the defendant reiterated his belief that he thought he was doing something patriotic and claimed that 'there were good people there.' He stated, 'I don't ever advocate violence,' and 'I would never hurt anybody in my life.' He told the interviewer that some of the police officers were waving them in when he entered, although he also acknowledged that it was 'not all of them.' The defendant stated that he does not dispute that he trespassed but that his 'entry was not violent,' referring to that allegation as 'fake news.' Remembering the 'overwhelming feeling to get in there with all the other patriots,' the defendant explained that 'I was in the front, so for all I know everyone was coming in and we were going to surround it and wave our flags and say we stopped the proceedings.' The interview concluded by reporting that the defendant would protest differently if he had the chance to do it again." Memo at 11. | No evidence Brady made statements in person or on social media immediately afterwards. He did, however, post a YouTube video in 2022 submitted by the Government as Sentencing Exhibit 1 showing what took place at the Upper West Terrace Doors where he entered the Capitol and describing how it seemed like police were letting people in. |

| (8) *"whether the defendant cooperated with, or ignored commands from law enforcement officials"* | |
|---|---|
| **Mariotto** | **Brady** |
| Mariotto passed established police lines in the Crypt and again at the Memorial Doors. | When officers outside Senator Schumer's office made it clear they were not going to allow Brady and the others to pass, Brady and the others retreated and moved toward the direction of the exits, following their instructions on how to leave the building. |

| *(9) "whether the defendant demonstrated sincere remorse or contrition"* ||
| **Mariotto** | **Brady** |
| "Upon being contacted by the FBI, the defendant immediately admitted to his presence in the Capitol and indicated that he would accept responsibility. He also admitted to the FBI that he had videos and photographs from that day on his phone and agreed to provide them to law enforcement." Memo at 14. | Brady stipulated to committing the offense of unlawful entry into a restricted area or building and has demonstrated remorse for his actions. |

It should further be noted that, like Brady, Mariotto had also never "had any trouble with the law . . . [o]utside a few speeding tickets." *Cf.* ECF Dkt. 32 at 9 with PSR at 13–14, Part B.

After considering the arguments and evidence presented by both parties, including the Government's request for a split sentence of four months incarceration, followed by a period of 36 months of probation and $500 in restitution, Judge Walton instead sentenced Mariotto to 36 months of probation, a $5000 fine, and $500 in restitution. *See* Judgment, ECF Dkt. 39.

With almost identical facts — and in some instances, factors that are even more aggravating compared to Brady's case — Mariotto's case stands as a firm example as to why a sentence of imprisonment should not be imposed in Brady's case.

If this Court is not satisfied with Judge Walton's resolution of a factually similar case, it can consider its own judgment, opinion, and sentence rendered in *United States v. Michael Shane Daughtry*, Case No. 21-cr-141-RDM, a case where like Brady, the defendant's sole count of conviction there was also for entering and remaining in a restricted area in violation of 18 U.S.C. § 1752(a)(1). *See* Judgment, ECF Dkt. 53. Although Daughtry did not enter the Capitol building, he was nevertheless one of the

first protestors to admittedly "[tear] down the fence and storm[] the Capitol." *See* Govt. Memo, ECF Dkt. 46 at 10. A former police officer, Daughtery admitted being one of the "first ones over the fence" and "[e]veryone followed us." *Id.* at 11. In that respect, one could argue that he directly contributed to the "violent attack" on the Capitol by tearing down fences that thousands of others subsequently crossed.

Even more shocking, prior to his unlawful entry on January 6, Daughtry, a licensed federal firearms dealer and owner of an armory business, had made several disturbing Facebook posts referencing firearms and ammunition to use "if the election don't go right tomorrow!" and, "When they finally start putting these Democrats in front of the firing squad for treason I hope they'll let me serve on the firing squad...I'll even bring my own ammo." *Id.* at 13–15.

Despite the Government's request for 4 months of home confinement, this Court wisely sentenced Daughtry to 36 months of probation but ordered home detention as a condition where he would be restricted to his residence for a period of 60 days to be monitored with location monitoring technology with exceptions only for employment, education, religious services, medical treatment, substance abuse treatment, mental health treatment, attorney visits, court appearances and ordered obligations, or other activities approved by his supervision officer. *See* Judgment, ECF Dkt. 53.

Brady would submit that a similar sentence is appropriate in his case from a parity standpoint. For one, the condition of home detention provides for a harsher sentence received by Mariotto who engaged in almost identical conduct. Second, said

condition also helps maintain parity with the sentence of Brady's co-defendant, Gary Wilson, who was also sentenced for a misdemeanor offense and sentenced by this Court to 30 days incarceration.

The most important factor, however, that sets Brady's case apart from any of these other cases — or any of the cases cited by the Government in their memorandum — is the Probation Office's recognition that a downward variance is appropriate in Brady's case given that he is a single father of two children, one of which requires a unique and special level of care. While a sentence of probation with home detention will restrict Brady's ability to freely travel or engage in leisurely activities, he will still be able to care for and attend to both his children's needs and obligations. A sentence of incarceration, however, even for a limited number of days, could place the children, especially A.K., in serious jeopardy to their health and well-being.

### 7. The Need to Provide Restitution to Any Victims of the Offense.

Brady has no objection to the Government's request for restitution. However, as a testament to his remorse and desire to help atone for his actions, rather than order $500 in restitution and a $25,000 fine as requested by the Government, *see* Govt. Memo, ECF Dkt. 269 at 33, 34, Brady is willing to accept and abide by an order for him to pay $25,000 in restitution for disbursement to the Architect of the Capitol to help repair for the damage to the Capitol building.

## VII.   Conclusion

Brady Knowlton will not be defined by his actions on January 6 and this Court should recognize those things that make his case unlike so many others. As he sets out in his letter to this Court, he is ready to return to his purpose in life, taking care of his family, helping others not only in his community, but around the world, and most importantly, working to repair the damage and division caused by his actions on January 6.

He respectfully requests that this Court sentence him to a term of probation of 36 months with home detention for the first six months as a condition of that probation, a $500 fine, $25,000 in restitution, and the mandatory assessment of $25.

Respectfully Submitted,

RONALD SULLIVAN LAW, PLLC

by: /s/ *Ronald S. Sullivan Jr.*
RONALD S. SULLIVAN JR.
D.C.D.C. Bar ID 451518
rsullivan@ronaldsullivanlaw.com

1300 I Street NW, Suite 400 E
Washington, DC 20005
Telephone: (202) 935-4347
Fax: (617) 496-2277

MAYR LAW, P.C.

by: /s/ *T. Brent Mayr*
T. BRENT MAYR
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone:  713-808-9613
Fax:  713-808-9613

WAGNER PLLC

by: /s/ *Camille Wagner*
CAMILLE WAGNER
DC Bar No. 1695930
law@myattorneywagner.com
1629 K Street NW, Suite 300
Washington, DC 20006
202-630-8812

*Attorneys for Brady Knowlton*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this memorandum, along with its respective exhibits, was sent to Counsel for the Government, Carolina Nevin, via CM/ECF and email, as well as representatives with the United States Probation Office on November 21, 2024.

/s/ *T. Brent Mayr*
T. BRENT MAYR
Attorney for Brady Knowlton