**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

BRADY KNOWLTON,

     *Defendant.*

Criminal Action No. 21-46 (RDM)

**EXHIBITS TO
DEFENDANT BRADY KNOWLTON'S
SENTENCING MEMORANDUM**

| | |
|---|---|
| **EXHIBIT A** | Letter by Brady Knowlton to this Court |
| **EXHIBIT B** | Letter from Robert Lackey, Ph.D. |
| **EXHIBIT C** | April 5, 2024 email to Aidee Gavito |
| **EXHIBIT D** | June 11, 2024 email to Aidee Gavito |
| **EXHIBIT E** | Character Reference Letters |

- Jason Ybarra
- Leonard Raphael Chengula
- Jed Dreher
- Hentie van Heerden
- Griselda Garcia
- Jake Graff
- Holly Webb
- JoAnna Larmore
- Subbayya Chowdary Yanamadala
- Darin Bain

**EXHIBIT A**                Letter by Brady Knowlton to this Court

Your Honor,

Words are a feeble atonement if anything at all. Still, I am hopeful that the Court will consider all I have to say here in determining what the sentence will be for me in this very unnecessary and tragic case. It is sad for everyone, including the country, myself, and most importantly, my children. Being considered part of the attack on the Capitol is not the legacy I want to leave for them. I want contributions from the life I have left to be the yardstick from which my amends will be measured.

On January 6, I made major mistakes. I failed as a father and as an American. I was not part of the solution but instead part of the problem. My actions were exceptionally short-sighted. I should not have been there. I allowed myself to become part of the wrong crowd on the wrong day. These behaviors are not who I am, and I will never allow them to occur again.

I humbly apologize to the Capitol Police, to the people of Washington, D.C., the members and staff of Congress, and to everyone impacted by my stupidity and the stupidity of so many others. Nothing in my history shows me seeking to divide people or society or inflict harm on others, but my actions, along with the actions of so many others that day, did just that, and I do not contest it.

I was not put on this earth to end ignorance or to conquer some injustice. Whatever brought me to Washington DC on that fateful day whether it be the consumption of the wrong media, poor choice, or poor fortune, I feel it took me there in an attempt to destroy my purpose. The videos and other evidence that I reviewed after being charged, in preparation for court and at trial, were sickening reminders of my role on that awful day. You can spend your life bringing people and businesses together and, in a couple of hours with a mob of disgruntled people, destroy all the businesses and all the relationships you spent your life building. Marriages, friendships, and business partnerships can crumble, and they have crumbled all around me.

I am ready to return to what my purpose is on this earth. My focus has always been and will continue to be my children. I have worked hard to support them and others around me. I want to work to build a world around them that is as far away from January 6 as possible, away from the division and the hatred. I want to return to helping build others up, picking them up from their lots in life, and helping them to live happy, productive, successful lives.

I hope that instead of closing this tragic chapter of my life by imprisoning me, the Court will permit me to make amends for contributing to the reserves of antipathy in my country by working to heal my family and my community. I can do the latter through community service to those in need. I am a businessman and a churchgoer, and I can help my community in those roles. Most importantly, I am a parent, and my presence and actions on January 6 have brought pain to my family and made my job as a parent more challenging in ways that I never could have anticipated.

Of all the things I do, I am best at being a father. I jeopardized that role when I went to Washington, D.C., on January 6. While I was married when I went there, that relationship was soon ended. My wife was hurt by my actions and how distant I became as a result of my case. It resulted in my children not having a family unit that offered stability and love. Now, I am a single father struggling with two children. That circumstance may not distinguish me from other defendants, but it is important, and there is more to consider in my family setting, and I want to take this opportunity to explain all that I have been through with them.

My daughter, A.K., is thirteen. She is autistic and suffers from a thought disorder. It is not possible to convey what it is to have a child who is autistic. The pain they are subjected to is indescribable.

When she was a baby, she screamed endlessly and never slept. At eighteen months, I noticed she would hide in the corner whenever other people were around. As she went through her toddler years, she isolated herself and did not interact. As she began to speak, it came out in an almost automated meta. The tone of her voice was light and lovely. She spoke in a slight sound that was both robotic and angelic. She has been in clinical treatment since she was four. She has severe misinterpretations, poor processing speed, low pragmatic language, and no understanding of social cues. Her diagnosis results in her being often violent towards her family and teachers.

Her struggles have been many. No child should have to endure what she has suffered. The sounds of loud machines drop her to the floor. She covers her ears as she attempts to escape from a pain we will never understand. Basic human interactions are a difficult calculus even now. She becomes very frustrated and confused. Her condition presents itself in challenging manifestations. When she feels like she has failed to communicate appropriately, at times, her response is violent. Basic daily demands such as waking, hygiene, and transitioning from one location to another lead to profane outbursts laden with expletives that seem out of character and out of place. She continually asks people she just met if they will give her an exorcism. This is a small glimpse into what life has been like for her.

A. entered her first autism school at age four at Behavioral Transformations in Rockwall, Texas. For two years, she solely attended school and therapy at their education center. We tried public school with assisted therapy from Behavioral Transformations, but it was unsuccessful and unsafe for the other students, and thus returned her to school at the education center.

At seven, I realized that we could not get the support A. required in Texas. The parental training and autism therapy were wonderful, but there were tremendous issues. The insurance companies would only allow therapists to work with her at school during a six-hour window. Getting one to work with her at home, in the car, or in the world where much of life takes place was almost impossible.

The result was that although A. became comfortable during school hours, her behavior at home was violent and destructive. She screamed and fought endlessly. I could simply not continue that path. We had to do something as this situation demanded change.
I began searching the country for other options. 2017, I began searching for schools but found the right facility in February 2019. I saw public school programs, private facilities, and treatment centers. I needed programs that provided therapists for in-home and in-community therapy. I drove to schools in Arkansas and then to Colorado. After that, I drove across the country from Portland, Oregon, to Portland, Maine. Some schools would not accept children who had behavioral issues. Some had students whose behavioral problems were too profound. Others had children whose verbal deficits were so significant that A. would not get sufficient social interaction. I visited so many I cannot remember them all. The time investment was tremendous, but I never regretted a moment as she needed me to help her, and I was only too happy to do so. Dealing with a complicated diagnosis requires a professional approach. I treated this job like it was my most important business, as it was.

I met up with a mother's group for moms of autistic children in Boulder, Colorado. I learned that four states have the best access to resources for autistic children from both an insurance and public resources perspective. Those states were California, Utah, New Jersey, and Massachusetts. Unfortunately, A. cannot live in an urban setting. She wanders off too easily. It has been terrifying for us at times and very tough on our neighbors. For this reason, we focused on Utah. It turned out to be a good choice.

I found a school in St. George, Utah, named Utah Behavior Services. This required uprooting our home and moving to an area where we knew no one and had no family. In my years of travel to find the resources that A. needed, I heard many schools talk about how great their resources, curriculum, and facilities are. But I saw a group of therapists I believed would love my daughter in Utah. Teachers capable of sincere compassion should be prioritized over academic curriculum in situations such as ours. We moved, and our bet paid off.

We moved there the last day of May in 2019. At that time, A. had as many as one hundred aggressive behaviors per day. There were many times when my son and my then-wife were scared to speak for fear of triggering an episode. In the four years she attended Utah Behavior Services, the team reduced the violent behaviors to one or two. Therapists worked hard taking her to the grocery store, the park, and on car rides while training her on how to react to stimuli. They trained me on how to restrain her properly and how to coach her through violent episodes. This was of tremendous benefit to our family.

A. had gained so much ground, but the school's clinical director recommended that she still need some additional resources. In January of 2023, she went into residential treatment for sixteen months. This caused extreme stress on me, my son, my then-wife, and, most of all, A. She went to two schools during that time. The first was Maple Lake Academy in Payson, Utah. It was five hours away from our home in St. George. We all missed her terribly. It was lonely without her. Visitations were limited by how well A. behaved. To add to the stress, the cost of the school was $19,000 a month.

Maple Lake Academy required a behavioral horizon of one week to determine if she would receive extra calls, visitations, or outings away from campus. This proved to be too long for her diagnosis. She could not restrain her aggression for this long. She only left campus two times in eight months. The school decided to dismiss her as she was not progressing, and the struggle continued.

We hired an educational consultant who specialized in finding schools for autistic children. She recommended New Focus Academy in Heber City, Utah, where she attended for eight months at the exact cost of Maple Lake. This was a much better fit. Their behavioral horizon was one day. Athens proved to be able to restrain aggression on most days and was able to leave campus more. She was not separated from the group as frequently. The therapist she was assigned was a great fit and knew how to communicate and how to reach her. Her aggressiveness became less frequent.

Her absence, however, resulted in a psychological pain more profound than anything I have encountered. It was hard on her brother, G., and I. I only got to speak to her twice a week, once by phone and once by Zoom. I tried to get the school to increase communication, but it continually failed to facilitate them. I rarely got to speak to her when the calls were unmonitored by staff. A. told us there were things that she wanted to tell us but could not. This became a problem. The school had helped but was not as good as it should been. My son only got to speak to her a few times during her entire time away. As the months passed, my daughter, son, and I grew very frustrated. The lack of communication was very damaging, and the near prohibition of unmonitored communication was concerning.

The balance between the damage to our relationship and lack of contact versus the benefits started to shift. We felt the deep pain of her absence and had concerns that it was too damaging for all of us. The separation added to the complexity of the situation.

However, minimal contact and constantly monitored communications were not the only problems. Over time, new issues began to develop. Being in treatment exposes the children to potential social contagions due to the combined amalgamation of the psychological issues the other girls suffer. A. picked up an eating disorder from being exposed to many other girls, which possessed them. This made keeping up her nutrition challenging. When she entered treatment, she ate a wide variety of foods. Now it takes coaching for her to eat anything outside of candy.

A. liked the school at first, but that changed. She began to complain of depression for the first time. It was difficult to assess her without being around her. The facility required my approval to make medication changes with little insight as to the stimuli to the behaviors and with only speaking to her minutes a week. The school had produced significant results, but they seemed to be diminishing. She was not progressing and wanted to be back with her family.

After my divorce from her stepmother, this became a much larger problem. Her needs changed. A. began to ask a lot of questions. Her staff member said that we needed to address the divorce. It was challenging to do without family counseling. We could simply not continue that path. Her brother wanted her back. They both expressed a desire to be around family more. They fought with each other a lot, but they wanted the chance to reconcile.

I began designing a shift in that direction while dealing with this case, which resulted from my terrible decision. I had been working with these issues with A. for nine years. I knew how to monitor meds and how to find the right counselors. I began talking with professionals in Texas. A better platform success was possible there, and we could be closer to family. My son and I bought a home and moved. After we moved to Texas, with A still in Utah, the monthly visits became extremely difficult—the status quo needed to change. I felt like I needed to catch the situation as it was falling. We decided to make an adjustment.

During her time in treatment, A.'s violent reactions were reduced but not eliminated. I had to find the right people to provide her with individualized treatment and education. I discovered a school in Texas called The Hope Center for Autism. The school's funding was donations-based. Since Covid, their donations dwindled, and it was forced to close. The staff had sixteen years of experience in dealing with kids diagnosed similarly to A. I proposed opening a new school that I would fund entirely. I decided to sponsor five students to attend with her at my expense. We built the program from the ground up to address the educational and behavioral problems that A. suffered.

A. would still receive therapy from her therapist at New Focus Academy. I engaged another therapist who specializes in coaching families in crisis. This therapist would help address the loss of their stepmother and the fighting between the kids. I also found a psychiatrist who would meet with us as often as we needed.

In May of this year, A. came home. The situation was much better for everyone. My hard work, experience, and training were paying off. We were living day-to-day, managing her episodes as best we could when they appeared. Some days were extremely challenging, but others were good.

In this setting, I was much more able to observe A. to address emerging concerns. A. made it clear that she was depressed and anxious. Her writings at her school reflected suicidal ideation. She said she told her staff about this, but it was never relayed to me. Her new psychiatrist seemed much better than the school's, and we made changes to her medications. It seemed to be alleviating the depression significantly. Her drawings and writing are not nearly as dark as when she first came home.

A., however, was still having difficulty maintaining friendships with peers. On many occasions, she provoked conflict for reasons that were difficult to ascertain. Her unusual manner of speech and frenetic movements caused some neurotypical peers to be cruel to her. We had to cut back on taking her to trampoline parks or other areas neurotypical teenagers frequent.

Caring for A.'s needs remains an extensive assignment. She must see psychiatrists, counselors, psychologists, and physicians. I drive her and accompany her to these sessions. My observations and attention are critical to her care. Her medications often change and constantly need to be assessed. It is difficult to determine the source of her episodes. Now that she is thirteen, A.'s condition is more complex as hormonal changes are present.

I am the only person A. has to lean on. I have had training in autism therapy for parents from Behavioral Transformations in Texas. I have the training and experience to help reach her when she is struggling. My parents are old and suffering from neurological issues. My brother works internationally most of the year. I have no one willing to take her, and understandably so, as her presence is dramatically life-altering. She requires that her caretaker understand the delicate communication needed when she is experiencing an episode. It takes patience and skill to talk her down and get her back.

I have and will continue to invest more of my life force into A., than other source.

However, my role and responsibility as a parent is not limited to A. My son, G., is eleven years old. He, too, started a new school this year in Texas. After his stepmom and I divorced, I asked him what he wanted to do. He wanted to be closer to his grandparents. This was the primary reason we moved from Utah back to Texas. During this tumultuous time, his grades suffered. In the last couple of years, his father was arrested and threatened with prison, his grandfather, who lived with us, died of cancer, his parents divorced, and his sister moved away. He stopped completing a lot of his assignments and was often distant. For quite some time, he refused to discuss his troubles. We found a counselor he liked, and he was able to get a lot of his troubles off his chest. I have worked with him a ton on homework and study habits. We have spent a lot of time and effort getting him back to his normal performance, and he finally got there on his last report card.

G. is young but very driven. He speaks fluent Mandarin and Spanish. We were lucky that he made it into a Mandarin immersion program in Utah. He has studied hard for almost six years now. He competes in basketball and martial arts. He has committed himself in ways beyond the commitments of his peers. I only ask him that when he chooses something, he needs to see it all through. He has chosen two sports and two languages. He has sports practices and language tutoring four days a week. He loves his teammates and his tutors. He gets bored very fast and is excited when he meets his goals. We are currently working with a family in crisis specialist to ensure our ship points in the correct direction. I do not want to be the cause of taking him off target again.

I recently sent G. to Africa for a month. I find it critical for him to see life in the third world and appreciate his home country. He must have a worldly perspective and learn from others who do not enjoy the quality of life we, as Americans, possess. The experience has been transformative. The trip caused him to mature in ways he otherwise could not. He is being much more grateful and clean. He saw sick people and poor living conditions. These experiences demonstrate that life can be the best teacher.

Whereas A. has always had her difficulties, G. has proven to be resilient through the tragedy around him. First, he had to deal with the consequences of my own behavior on January 6. After my arrest, invitations for G. to attend birthday parties and sleepovers disappeared. I have apologized sincerely to my children for this. My responsibility to heal begins with them at home. I have a lot of work to do, and it is not easy.

From 2017 until 2022, we cared for my then-wife's father as he fought a terrible battle with colon cancer. He had been in the children's life since they were tiny. They looked to him as their grandfather. In February of 2022, he succumbed to his illness and passed away. This was also difficult and tragic for G. and our entire family. As the end came, it was ugly, unforgiving, and ferocious.

Then, there was the impact my own actions and her father's death were having on my then-wife, Rebekka. She adored her father, who had raised her on his own for much of her life. They were best friends, and he was her primary confidant. It was why, when we made the move to Utah for Athens to attend school there, I also moved her father up there with us. They maintained a relationship of constant contact. Her father was involved in most of her decisions.

Rebekka had been the only mother the children had known. She had been with them since 2016. After her father died, she became highly distant. She began to drink outside of the home, and her mental health disappeared. She became despondent and unreachable.

At this point, this letter becomes very difficult to write. I woke up in the middle of the night towards the end of July 2023. I discovered Rebekka drunk and on the phone. When I took the phone, I discovered explicit messages between her and our old babysitter's son, who was sixteen. My world crashed.

As difficult as it was, I had to tell her to leave, and she did. I later learned, however, that she had returned and consummated further unlawful acts with the boy. These events impacted me not only because of the impact they had on me and my children but also because of my experience of having been sexually abused as a child by a mentally ill family member. I held that experience against my parents, and the anger it caused me created exceptional hardships in my youth. I learned from my own experience that these are not the type of secrets a person can bear to keep. I had worked my whole life protecting my children and others from these acts for most of my adult life. I felt that I had to report it no matter how uncomfortable, and I did. As I write this letter, she is being prosecuted in Utah.

Before her father died, she had been an idyllic wife and mother. She was kind and devoted. I loved Rebekka more than anyone else in my history. The children adored her to no end. She was set to adopt them. I believe my actions on January 6 are partly to blame for her falling so far.

The first year after the death of her father, I was very supportive. We were doing counseling and involved in lots of church activities. However, as the year anniversary passed, I became more involved in my case and less attentive to my wife. I feel a tremendous guilt for this that words fail to describe.

The separation from her has been difficult for the children. Their biological mother has not seen them in almost eight years, as her parental rights were terminated in 2023 after succumbing to drug and alcohol addiction and being unable to follow court orders to protect the children on numerous occasions. Rebekka, who had been the closest thing they had to a mother, has been out of their lives for close to a year.

Every day, I wake up and tend to the children, hoping we can get to a better place. A. has school year-round, and the mornings are always tricky. Her medications have a holdover that is difficult for her to break free from. She generally starts the day by throwing obscenities at me as I struggle to wake her. The cost of not giving her the medication results in guaranteed insomnia. She will rarely sleep unmedicated.

G. must be at school at 8:00 AM and Athens at 8:30 AM. I then rush back home and try to get as much work done as possible before heading back out at 2:30 to get them as school ends.

G. has online language tutoring Monday through Thursday at 4:00 PM. On those same days, I take him to sports. He has basketball or martial arts at 5:30 PM. He loves my cooking and insists on it. My steaks and salmon are the best he has had. The only real food A. eats now is chicken, fruit, and hashbrowns. She would prefer no food of substance and processed sugars in their place.

My children love going to church. They more so take me than I take them. It is one of the few opportunities my daughter has to be around neurotypical children in a social setting where she feels safe. The staff at church is very patient and accepting. On Wednesday nights, there is a youth program for kids from 6th grade to 12th grade. My daughter does not speak much but finds watching the "normal kids" compelling. Another church has a Saturday night video program that my children enjoy. Then again, on Sunday mornings, they like the standard service.

We spend a lot of time around nature and animals. A. finds relating to animals much more manageable than people. G. just likes the fun of dogs and horses. We live on six acres, and our neighbors have horses. I take the kids horse riding one at a time. I could take both, but they like my individual attention when they are on the horses and will argue if they do not get it. G. likes to go fishing at the nearby lake, but he stops quickly if they are not biting.

Aside from my children, I also have my career to give attention to and continue supporting them. I sincerely felt that before January 6, I had worked diligently to bring people together. Fifteen years ago, I was blessed with business success. My best friend and I started a private equity fund in our twenties, which provided insurance companies and college endowments an avenue to invest in the oil industry. With their investment, we bought older oil fields, made them environmentally sound, and optimized them with modern equipment. We increased revenues, and the business has been doing very well.

At the same time, I had to do more than just run a business. Many members of our armed forces were returning home from wars in the Middle East. Many of the soldiers had been maimed while in service to our Country. One of my first action courses was contacting The Wounded Warrior Foundation. I asked them to get me in contact with wounded veterans who had an interest in the outdoors. I was privileged to meet veterans who had suffered amputations as a result of combat. I took these gentlemen all across the Country and to Africa. We spent a lot of incredible time together. I saw them begin to enjoy life again.

The camaraderie I felt with these men truly uplifted me. It showed me how vital public service is and how enriching it can be. This put me on a path of volunteering as an expression of gratitude for what this Country had done for me.

In the following years, I did my best in this pursuit. I loved volunteering at The Bridge Homeless shelter in Dallas. I thought that since I went to inner city schools on the east side of Dallas, I had not

grown up in a bubble. I was wrong. I found that much of our view of the homeless problem is incorrect. Substance abuse and mental illness are the cause for many, but not all. While volunteering in the intake department, I saw that many of us had unfortunately fallen on hard times and needed just a step to get back on life's ladder. It taught me that to learn more about our society, you must work with it and reach into it. I regret that this understanding was not in my mind on January 6.

The Bridge was very proficient at helping people find work. More than once, I had met someone in intake and just a few days later saw them working as a cashier at Walgreens or holding a sign for a construction crew.

After volunteering at The Bridge, I began focusing on an issue that affected my family. I had a portion of my childhood which was spent in rural poverty. I had seen what poverty does to children and families and felt compelled to work in this area. Domestic violence is a common manifestation of the stresses of being impoverished. My closest cousins had spent time in foster homes as they had been severely abused.

My mother had been a CASA, a court-appointed special advocate, for many years. She advocated for the best interest of many, many children who were in the care of Child Protective Services. As a result of witnessing my mother's work and my cousins' misfortune, I chose to contribute and joined CASA in Collin County, Texas. It was challenging but essential work. Work that I wish that I could one day do again.

Watching the court system inspired me to go to law school later in life. I went to the University of Denver and completed my legal education with a proud ranking in my cohort. My goal was to work in pro bono and low bono law representing victims of domestic violence. I represented these individuals as a student attorney in Southern Utah for two years. I worked for Utah Legal Services and a private law firm. Most of my clients had been raised in rural poverty. My goal was to continue doing this work after law school. I have let them down by participating in the events in DC. As a result of January 6, my law degree was withheld, and I was not allowed to graduate. I am no longer allowed to volunteer as a CASA and am not eligible to volunteer in many of the ways that I seek to pursue.

I had worked for many years with the Maasai tribe in East Africa. I funded and organized the construction of shelters and was even privileged to work with an orphanage that I saw doing some really great work. In 2010, I was made an honorary member of the tribe. Since January 6, I have not been able to return to them or to Africa, a place that I love.

Growing up just East of Dallas, I learned Spanish. As I got older and had a bit of business success. I noticed that many of my friends who were equally or more talented than me had difficulty finding financing for their businesses. It was quite common, especially ten years ago, for minority businesspeople to have more difficulty getting financing for their projects than non-minorities. In 2011, I began funding Hispanic-owned businesses and did a project every three years until January 6. We started an auto-lending business that provided funding to Hispanic-owned auto-dealers. A few years later, I met a man in Mexico who had dreamed of opening a restaurant. He had proven to be a fantastic chef and a great entrepreneur. I funded that project and partnered with him. In 2020, I also funded a software company that provides the first Spanish auto-dealer management software in the USA. It does its accounting, inventory, and financing.

I continue to find minority-owned businesses that deserve funding. Last September, I financed a rental car company locally owned in Turks and Caicos. The owner is another dynamo who just

needed a chance. If the court gives me community service and gives me the opportunity, I will continue finding business owners like these wherever they are located.

My actions that day caused severe distress to the business. Due to my actions, I have not been able to represent these businesses and help them get additional financing. My banking contacts look at me like I am radioactive. Being charged with a felony is enough to do that on its own. But being a quote "J6er" makes it much worse. I can't get financing like before. I can't go into businesses to sell software and barely travel to the restaurant. As a result of my actions, these businesses, my partners, and the employees have all suffered. The auto-lending business, which had dozens of employees, will be closing after 13 years in business, the software business is severely struggling, and the restaurant is day by day.

I feel a great responsibility to these businesses and their ownership. I think that in time, we can overcome many of the challenges we are currently facing. I continue to help where I can and look forward to finding a path to helping more. There will be light through the clouds; we must keep up the challenge until it comes.

As you can see, my history has been one of positivity. Outside of January 6, I have always been a good father, son, citizen, friend, and business partner. I am seeking to remedy the damage resulting from my actions. I have spent much of my life bringing people together. I want to continue working towards that effort.

Again, I am deeply sorry for my actions on January 6. I look back on this chapter of my life and have learned never to lose sight of my purpose. My most important role today is that of a single father. My eyes are set on righting the past and building my children's future. My heart is most accountable to them in life. Please do not separate us. The bond I have with my children is theirs and my only comfort.

Respectfully,

Brady Knowlton

**EXHIBIT B**            Letter from Robert Lackey, Ph.D.

 **SPARTAN PSYCHOLOGICAL CONSULTING**

## Robert Lackey, Ph.D.

**Licensed Psychologist**
**Email: spartanconsulting@charter.net**
**Cell phone: 817-988-1161**

June 24, 2024

Honorable Randolph Moss

333 Constitution Ave NW

Washington, DC 20001-2800

To the Honorable Judge Moss,

My name is Robert D. Lackey, PhD and I am a psychologist in Texas. I previously was retained by Mr. Brady Knowlton to assist in a family law matter in Texas which spanned several years. During this time, my primary role in the case was to speak to the court with regards to his two minor children's social, emotional, and behavioral functioning.

During this time, approximately six years, I was able to work with his children and give testimony to courts on their functioning and growth over time. Mr. Knowlton's oldest child, his daughter, A███, was diagnosed at a young age as having autism spectrum disorder. As she has aged her diagnostic impressions appear to have changed with her exhibiting symptoms more consistent with a schizophrenia spectrum disorder, most likely schizoaffective disorder.  A███ has a severe mental illness and needs constant care and supervision. She has required ample treatments including medication management and therapy as well as short-term and long-term residential care.

Mr. Knowlton has always been central to his daughter's care and treatment. Mr. Knowlton consulted me throughout the process of gaining treatment for his daughter and her treatment and success was always his utmost concern. His remaining in her life to aid, support and champion her success and assisting in providing her opportunities for the greatest quality of life is paramount.

Please view this letter as advisory in nature.

Respectfully submitted,

Robert D. Lackey, Ph.D.
Licensed Psychologist #34050

**EXHIBIT C**          April 5, 2024 email to Aidee Gavito

**Brent Mayr**

| | |
|---|---|
| **From:** | Brent Mayr |
| **Sent:** | Friday, April 5, 2024 5:02 PM |
| **To:** | Aidee Gavito |
| **Cc:** | rsullivan@ronaldsullivanlaw.com |
| **Subject:** | RE: BRADY KNOWLTON (2)  - 21CR46 |
| **Attachments:** | Knowlton_PROB_0001.pdf; Knowlton_PROB_48.pdf; Knowlton_PROB_48B.pdf; Knowlton_Presentence Releases.pdf |

Good afternoon, Aidee.

Attached are Mr. Knowlton's PROB 1, 48, and 48B forms, as well as his signed releases.

We're still working on gathering all the accompanying documentation for the 48A, 48C, and 48F. On one of my other J6 cases, the officer did not require anything other than my client's 1040s (even though he owned his own business). Could you confirm whether you are requesting all the 48A, 48C, and 48F items? As you will see from the PROB 48, my client has several bank accounts, properties, businesses, and other assets. As for being a party to a civil suit, he recently completed a custody battle with his ex-wife – do you need all the documents related to that "civil litigation"?

I appreciate the clarification. Again, this is not to avoid providing you with these items – it's just that there are literally volumes of documents related to just his custody litigation alone.

Thanks.

BM

**From:** Aidee Gavito <Aidee_Gavito@dcp.uscourts.gov>
**Sent:** Monday, April 1, 2024 1:15 PM
**To:** Brent Mayr <bmayr@mayr-law.com>
**Cc:** rsullivan@ronaldsullivanlaw.com
**Subject:** RE: BRADY KNOWLTON (2) - 21CR46

Thank you, Mr. Mayr:  I've calendared the 15th at 1:30pm (EST). I'll call your office and then we can merge Mr. Knowlton into the call.

I appreciate all your help with the forms. Please don't rush, if I can get the documents this week, great, if not, next week will also work.

Thank you,

Aidee V. Gavito
United States Probation Officer
333 Constitution Avenue NW
Washington, DC 20001

Email: aidee_gavito@dcp.uscourts.gov

---

**From:** Brent Mayr <bmayr@mayr-law.com>
**Sent:** Saturday, March 30, 2024 1:29 PM
**To:** Aidee Gavito <Aidee_Gavito@dcp.uscourts.gov>
**Cc:** rsullivan@ronaldsullivanlaw.com
**Subject:** RE: BRADY KNOWLTON (2) - 21CR46

<mark>CAUTION - EXTERNAL:</mark>

We'll do Monday the 15th at 1:30. We're still working on the PROB 1 and other releases and hope to have them to you this week.

BM

**Brent Mayr**
Managing Shareholder
Attorney and Counselor at Law



Phone 713-808-9613  Fax 713-808-9991
Web mayr-law.com  Email bmayr@mayr-law.com
Houston Office: 5300 Memorial Drive, Suite 750, Houston, TX 77007
The Woodlands Office: 1095 Evergreen Circle, Suite 200, The Woodlands, TX 77380
Victoria Office: One O'Connor Plaza, 101 W. Goodwin, Suite 400, Victoria, TX 77901

 

2014 / 2015 / 2016 / 2017 / 2018 / 2019 / 2020 / 2021 / 2022 / 2023

I.R.S. CIRCULAR 230 DISCLOSURE: As required by United States Treasury Regulations, you should be aware that this communication is not intended or written by the sender to be used, and it cannot be used, by any recipient for the purpose of avoiding penalties that may be imposed on the recipient under United States federal tax laws. THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.

If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by e-mail or telephone, and delete the original message immediately. For more information, please visit www.mayr-law.com.

**From:** Aidee Gavito <Aidee_Gavito@dcp.uscourts.gov>
**Sent:** Friday, March 29, 2024 2:32 PM
**To:** Camille L Wagner <law@myattorneywagner.com>; rsullivan@ronaldsullivanlaw.com; Brent Mayr <bmayr@mayr-law.com>
**Subject:** RE: BRADY KNOWLTON (2) - 21CR46

Mr. Mayr, my apologies – I inadvertently did not include you in the previous email.

Thank you,

Aidee V. Gavito
United States Probation Officer
333 Constitution Avenue NW
Washington, DC 20001

██████████████████

Email: aidee_gavito@dcp.uscourts.gov

---

**From:** Aidee Gavito
**Sent:** Friday, March 29, 2024 3:30 PM
**To:** Camille L Wagner <law@myattorneywagner.com>; rsullivan@ronaldsullivanlaw.com
**Subject:** RE: BRADY KNOWLTON (2) - 21CR46

Good afternoon, Counsel:

I am assigned to prepare the presentence investigation report in your client's case. I'd like to schedule a presentence interview. The interview will be conducted telephonically, unless your client resides in the D.C. metropolitan area. Please let me know if any of the following dates/times work with your schedule:

April
Tuesday 9th – 10:30AM / 11:30AM / 12:30PM/ 1:30PM/ or 2:30PM
Wednesday 10th - 10:30AM / 11:30AM / 12:30PM/ 1:30PM / or 2:30PM
Thursday 11th – 10AM
Friday 12th - 10:30AM / 11:30AM / 12:30PM/ 1:30PM / or 2:30PM
Monday 15th - 10:30AM / 11:30AM / 12:30PM/ 1:30PM / or 2:30PM
Tuesday 16th - 10:30AM / 11:30AM / 12:30PM/ 1:30PM / or 2:30PM
Wednesday 17th - 10:30AM / 11:30AM / 12:30PM

At your earliest convenience, please email the completed questionnaires and signed release forms.

Thank you,

Aidee V. Gavito
United States Probation Officer
333 Constitution Avenue NW
Washington, DC 20001

██████████████████

Email: aidee_gavito@dcp.uscourts.gov

---

**From:** Renee Moses-Gregory <Renee_Moses-Gregory@dcp.uscourts.gov>
**Sent:** Monday, March 25, 2024 4:27 PM
**To:** John Pierce <jpierce@johnpiercelaw.com>; Roger Roots <rroots@johnpiercelaw.com>; Camille L Wagner <law@myattorneywagner.com>; rsullivan@ronaldsullivanlaw.com; Brent Mayr <bmayr@mayr-law.com>; David Benowitz <David@pricebenowitz.com>; Rammy Barbari <rammy@pricebenowitz.com>
**Cc:** carolina.nevin@usdoj.gov; Moran, Kelly (USADC) <kelly.moran@usdoj.gov>; karen.rochlin@usdoj.gov; Pearce, James

(CRM) <James.Pearce@usdoj.gov>; Aidee Gavito <Aidee_Gavito@dcp.uscourts.gov>
**Subject:** PATRICK MONTGOMERY (1), BRADY KNOWLTON (2), GARY WILSON (3) - 21CR46

Good Afternoon,

Your clients have been referred to our office for a presentence report. USPO Aidee Gavito ███████████ copied on this email, has been assigned to prepare the presentence report and will contact you with her dates/times of availability for the initial interview.

Because the initial interview should be completed *within 14 days* of referral, to expedite the presentence investigation, attached are the: presentence questionnaire; release of information forms; and financial forms for your client to complete. A list of supporting documentation is also included to assist your client in identifying documentation that is necessary for verifying certain matters, as well as to support reported financial information.

Prior to the interview, please have your client complete the presentence questionnaire and sign/date the release forms, which should be returned to the assigned probation officer preferably within *seven days* of today. If your client is incarcerated, please provide USPO Gavito the name of the facility where your client is housed.

*Additionally, to the parties* – please note the presentence report will have an attached form titled, **"Parties Obligation and Response to Presentence Report."** This form will reflect, pursuant to the Court's Sentencing Order and Rule 32, the date by which any responses and/or objections to the report must be provided to the probation office and the opposing party. This form and any objections to the draft presentence report, must be filed by the parties on CM/ECF. However, because opposing party will not have access to the document through the system generated Notice of Electronic Filing ["Parties Obligation and Response to Presentence Report" under Criminal Events> Other Filings> and Other Documents.], opposing party must be served by whatever means counsel deems appropriate.

If there are any questions and/or concerns, please feel free to contact our office. Thank you in advance for your cooperation.

Renée Moses-Gregory
Assistant Deputy Chief United States Probation Officer
333 Constitution Avenue, NW
Washington, DC 20001
███████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**EXHIBIT D**          June 11, 2024 email to Aidee Gavito

**Brent Mayr**

| | |
|---|---|
| **From:** | Brent Mayr |
| **Sent:** | Tuesday, June 11, 2024 11:58 AM |
| **To:** | Aidee Gavito |
| **Cc:** | rsullivan@ronaldsullivanlaw.com; Nevin, Carolina (USADC); Moran, Kelly (USADC) |
| **Subject:** | RE: BRADY KNOWLTON (2)  - 21CR46 |
| **Attachments:** | Knowlton_Non-Substantive Changes to PSR.pdf |

Good afternoon, Aidee.

I wanted to give you a heads up that the Government and I are working to seek a continuance from the presently scheduled sentencing date for Mr. Knowlton, as well as the deadline for submitting our objections to the PSR. I will cc you when we get our motion filed; we are just confirming availability for new dates.

In the meantime, I have attached a list of non-substantive/non-material changes and corrections that we caught going through the draft.

Please confirm receipt and let me know if you have any questions or concerns.

Also, please confirm that you were able to connect with his brother, Corey, to verify the personal and family data.

Thanks.

BM

**EXHIBIT E**            Character Reference Letters

Jason R. Ybarra
President/CEO, TexCap Financial, LLC
Founding Member, National Hispanic Automobile Association

To:    Honorable Randolph D. Moss,
       United States District Court, 333
       Constitution Avenue, N.W. Room 6710
       Washington, DC 20001

Dear Judge Moss:

I am writing to you regarding Brady A. Knowlton. I have known Mr. Knowlton for more than 14 years. Mr. Knowlton assisted me in my professional and personal growth and helped me to remain centered and focused during my most trying times as a leader.

Mr. Brady personally invested in TexCap Financial, LLC, which I serve as CEO of. In our business, we employ more than 20 people. These employees benefit from above-average compensation structures and health insurance fully supported by TexCap. TexCap serves the underserved business community and its customers, who tend to be exploited and underserved. In our program, we promote small businesses and the communities they serve by providing financial solutions that would otherwise be unattainable. We assist these businesses, which operate in primarily underserved communities, with cash, data analytics, and compliance best practices to aid them in building profitable businesses. We also assist customers with building their credit profiles while providing a means to obtain reliable and much-needed transportation solutions to support their careers and familial needs.

As a friend, Brady has supported me in many ways. Not long ago, he gave me directions to help me make an important personal decision. The direction he provided me directly conflicted with general investors' desires to continue to grow their investments and reduce personal losses. Brady cared about me and how my family would be impacted. While I am sure he was concerned about his investment, he did not allow his concerns to get in the way of helping another human being. During my most trying times, I have leaned on Brady for advice, guidance, and support. I have seen his commitment to humanity in his service to others, from assisting single mothers to working with addicts to improve their lives. I have seen him devote financial resources and time and leverage his network to help others.

I grew up in the heart of Dallas, Texas to a single mother with little to no resources and, at times, very little hope. Two important things have come because of my meeting Brady. I have supported my family in ways I could have never imagined. My daughter just graduated from Berkeley College of Music in Boston. She graduated from both high

school and college in 3 years respectively. She has often cited her experience in watching my progress through my career as a primary driver behind her desire to do well and work hard in life and her career. She would not have had that experience had not met Brady. He has inspired me to work hard to improve my financial situation so that I too can help smart hard-working people in their desire to become entrepreneurs. People with solid ideas and skills but unable to afford blue-chip educations. People who just need an opportunity and the support of others who have been where they are.

I appreciate your attention to this letter. Thank you for your time and consideration.


Jason R. Ybarra

Jybarre1@icloud.com

Leonard Raphael Chengula
P.O. Box 398
Tungamalenga Village
Iringa , Tanzania
Mobile +255 767 135 383

**Honorable Randolph Moss**
**333 Constitution Ave NW**
**Washington, DC 20001-2800**

**18 June 2024**

REF: CHARACTER REFERENCE FOR MR BRADY KNOWLTON

**Dear Sir**

My name is Leonard Raphael Chengula, I was the Chairman of the MBOMIPA Community Wildlife
Management Area from 2007 to 2011 and managed the operations of both wildlife management and
photographic safari areas within the community area, for the benefit of the 21 member villages in
Iringa Region in Tanzania.

 I had the pleasure to go meet Mr Brady Knowlton in October of 2009 in the hunting camp of
Kilombero North Safaris Ltd, to thank him for his generosity to our local communities who were
experiancing severe hardship and food shortage due to the drought and crop failure.

Mr. Knowlton contributed generously many thousands of dollars for maize grain to be bought and
milled and distributed to the local community of Mboliboli and Itunundu Village, which are in a very
remote and drought stricken area, where even NGOs charity is unheard off.

The timely kindness and generosity of Mr Brady Knowlton was monumental for our people and
received with great gratitude, especialy by the Masai pastoralists who were the hardest hit by the
drought and in apreciation even conducted his marriage ceremony.

In swahili we say "*Hakuna mtu aliokamilika sisi sote ni binadamu*" which means "nobody is perfect
we are all decendants of Adam ", meaning we are all human and all make mistakes. Our community
is sadened to hear of Mr Brady Knowltons mistakes, and kindly request you take his humanity into
consideration as we still remember his kind generosity during our time of need, and we only wish the
best for him and his family.

We remain hopeful of your kind consideration.

Leonard Raphael Chengula

To whom it may concern:                                                                6-17-24

My name is Jed Dreher, I offer outdoor adventures in Texas. In 2010, I was contacted by Brady Knowlton. He was organizing a charity hog hunt for a group of disabled veterans. My services had to be adapted in order to accommodate their disabilities which included amputations, had to be redesigned to fit their limitations. While I have always had a special place in my heart for the veterans, and the sacrifices they have made for us, Brady took this mission to a whole another level. He was determined to provide these guys with a once in a life time experience.

Brady, sponsored this two day adventure, which we offered at a discounted fee. We took a couple men named Alex Leonard and Tyler Sloan. These two men had such a wonderful time, and they were so appreciative to Brady and my crew. These two veterans smiled and laughed during the hunt, and for a short two day period they were able to escape the war and the tragic events that led to their disabilities. Brady interacted with these guys like they were his very own brothers. I can attest to Brady's commitment to our wounded veterans.

These men were extremely grateful, and I was happy that we could show them that life has many opportunities for them despite the tough circumstances they have been delt.

Respectfully,
Jed Dreher

Jed Dreher



## THE ULTIMATE NAMIBIAN HUNTING SAFARI

Barend Hendrik van Heerden - Professional Hunter (Big Game):
*Cell: +264 81 22 82 189*
Denise van Heerden (Office):
*Cell: +264 81 127 41 55*
P.O. Box 30208 / Pioneers Park / NAMIBIA
E-mail: vhsaf@africaonline.com.na

June 18th, 2024

Dear honorable Judge Randolph Moss

I am writing on behalf of Mr. Brady Knowlton whom I know for twenty years. He has a kind and generous heart.

In 2011, Mr. Knowlton sponsored a safari in Namibia with my firm for two wounded American veterans that were severely injured in the Iraq war. On Mr. Knowlton's request we made special adaptations to our accommodation and safari vehicles to ensure they had a wonderful and safe time.

This included a full camp and staff for two weeks. It was an honor for us to be part of such a safari and a great experience to co-host with Mr. Knowlton for the two veterans.

Brady Knowlton has always been available for advice to me and my young family through the years.

Please take this into consideration as he is an asset to the world's community.

Respectfully,

Hentie van Heerden

www.vanheerdensafaris.com

Griselda Garcia
2002 Willow Ln.
Plano, TX 75074

Honorable Judge Moss,

My name is Griselda Garcia. I began working as a housekeeper for Brady Knowlton in
2013. I Live with him and his children five days a week. I know him and the children
very well. My duties include keeping up with the home and helping with the children. I
come on Sunday night and stay until Friday.

I have very bad vision. I have a disease in my corneas called keratoconus. I work very
hard at caring for the home and the children when I am needed but vision causes me
some limitations. I do not feel safe driving with the children.

Brady Knowlton has been very good to me. He has always paid me very well and been
very understanding if I need time off. He has helped me in many ways. I recently
needed emergency surgery and he paid for the entire procedure.

He is very close to his children and is an amazing father. his daughter's name is A█████
She has autism and requires a very patient person to care for her. She can be violent at
times and he always responds to her very calmy. She has extreme mood swings and is
frequently unstable. He is very good at communicating with her during these times. She
loves him and sees him ass her problem solver. He is the only one that can manage her
in the difficult times.

The mornings are very difficult. A█████ does not like to get out of bed and she fights to
stay there. She also protests taking showers and brushing her teeth. Brady is very good
at motivating her in a soft manner. She prefers his attention to others.

Brady is very frequently talking to her therapists or meeting with counselors. A█████
requires medications and they change them often. She has many appointments to keep
and I cannot take her.

His son's name is A█████. he is a very good boy. He is very busy with sports and his
father is takes him to many practices. They do a lot of exercises and spend good time
together with these activities. He loves his father very much.

Brady had a divorce with the children's stepmother. They were very close to her and it
has been very painful. A█████ has been very sad at times. I see him trying to give him
comfort. The recent years have been hard for the kids.

The children are very close Brady. They love and need him greatly. They are very
scared that he is going to prison and that they will be alone or with strangers. A████████

has said this to me many times. I would ask you to please let him stay with the children. I too will miss them badly if they are taken away from me. I love this family very much.

Thank you,

Griselda Garcia



*A PROFESSIONAL CORPORATION*

*Licensed in Nevada & Utah*

June 7, 2024

*Via E-Mail Only to:*

Honorable Randolph Moss
333 Constitution Ave NW
Washington, DC 20001-2800

      Re:    *United States v. Brady Knowlton*
               *Case No. 21-cr-46*

Dear Judge Moss:

      I am an attorney in St. George, Utah. Mr. Brady Knowlton worked as an intern for my former law firm for several months in 2020 when he was a part-time (weekend) law student at the Sturm College of Law in Denver, Colorado. Mr. Knowlton and his family had relocated to Washington County, Utah a year or two earlier. He commuted to his law school on weekends and interned at our law firm during the work week. I was a partner at the law firm of Bangerter Frazier & Graff, PC at the time and Mr. Knowlton worked as our intern the entire fall semester of 2020.

      Mr. Knowlton has a very unique and impressive skill set. He was very knowledgeable and helpful while serving as our intern. Because he worked without any compensation, we assigned him to work on several cases where our clients were indigent or had difficulty paying their legal fees. I believe strongly in always striving to do pro bono and low bono work in this profession to give back to the community but it is challenging to find the time and resources to handle such cases at a small law firm. I was very grateful to and impressed by Mr. Knowlton's willingness to work on such cases without any complaints. He worked diligently for our clients, despite not having a personal or equitable stake in the outcome of the cases. We deeply appreciated Mr. Knowlton's contributions to our clients at that time.

      Mr. Knowlton was a welcome addition to the firm. He was fun, agreeable and truly humble (a trait that is hard to find in the legal profession). He was eager to learn and teachable. He had no attitude even though he had more experience in business and life than most of his colleagues at the firm. Mr. Knowlton had no pretenses. He was very personable, thoughtful, and generous. I recall him quietly giving a nice gift he had "won" in a game at a firm holiday party to a young man in attendance who had left disappointed because he really wanted that gift. Mr. Knowlton did not do it in front of the firm but pulled him aside afterwards and gave it to him. Mr. Knowlton would bring drinks and treats to the firm. I saw him take a seasoned paralegal who felt that life had passed

him by to lunch to encourage him in his educational journey and career pursuits. Again, he did that quietly without any attempt to draw attention to himself. I know he did that with other employees at our firm as well. He just stepped in and cared about people he had only known for a few months. I also found out over time that he was caring for a relative who was dying of cancer while he worked at our firm. That is just the kind of person Brady Knowlton is. As I got to know him better, I enjoyed our many conversations about our love of God, our families and this great country.

Although I do not agree with Mr. Knowlton's actions on January 6, 2021, I do not believe that they were a true representation of who he is as a person. I know Mr. Knowlton to be a very committed and loving parent to his children including to a special needs child who he loves deeply. I knew him as a committed law student and hardworking business owner. I knew him as a humble and dedicated intern. I know him as a man who genuinely cares about those around him. He provided very meaningful assistance to our firm during his internship and became a true friend in the process. To this day, he continues to reach out to check on me and my family on a regular basis even though he has moved away from the area.

If you have any questions for me, please do not hesitate to contact me.

Sincerely,

**GRAFF VAN, PLLC**

*/s/ Jake Graff*

K. Jake Graff
Attorney at Law
*Licensed in Nevada & Utah*



229 E. St. George Blvd. #103, St. George, Utah 84770 * 435-628-1604 * Fax: 435-986-7163 * www.utahlegalservices.org

June 11, 2024

*Re: Brady Knowlton Letter of Recommendation*

To Whom It May Concern:

Brady Knowlton rendered his volunteer services for legal research and drafting legal documents through an internship during 2020 while attending school for a law degree. He gathered further knowledge from our experienced attorney's review and edits to his drafted documents. His understanding of the law and grasp of legal issues is adept. Brady's work was impeccable and timely. The results enabled us to gain court orders assisting us to receive evidence and information that otherwise may not have been achieved. This in turn allowed us to be successful with negotiations in cases where children's best interests and safety were at stake. We were able to attain orders to protect children and their custodial parent. Brady as a third-year law student practitioner, under the watch of a licensed attorney, prepared for and represented agency clients in court hearings and gained practical court room experience.

Brady is dedicated to giving his best and is dependable in his attendance. His work ethic is commendable. Brady is interesting, very personable and easy to converse with. His life experiences are varied and vast. He speaks Spanish which was useful with our foreign clientele who he graciously interpreted for when needed. We strongly recommend Brady for any position he seeks.

Sincerely,

*Holly Webb*
Holly Webb
Utah Legal Services
Staff Paralegal for
Staff Attorney at Law
(435) 628-1604 x3652
hwebb@utahlegalservices.org

**Ogden**
298 24th St., #110
84401
801-394-9431
Fax: 801-827-0420

**Salt Lake City**
205 N. 400 W.
84103
801-328-8891
Fax: 801-869-2721

**Provo**
455 N. University #100
84601
801-374-6766
Fax: 801-655-5350

**St. George**
229 E. St. George Blvd. #103
84770
435-628-1604
Fax: 435-986-7163



Toll Free (outside of Salt Lake County): 1-800-662-4245

14 June 2024

To Whom It May Concern,

This is to verify that Brady Knowlton was a volunteer at Utah Legal Services from late 2019 to mid-2020.

As a volunteer Mr. Knowlton helped victims of domestic violence by representing them in court for protective order cases, prepare custody and divorce documents and translating for Spanish speaking clients under the supervision of the managing supervisor.

Mr. Knowlton when above and beyond by for domestic violence clients by also serving custody and divorce documents on respondents that were evading service in cases.

Mr. Knowlton served his community by volunteering countless hours in research, document preparation and court appearances.

Sincerely,

JoAnna Larmore

Former paralegal Utah Legal Services

Subbayya Chowdary Yanamadala

14114 Dallas Pkwy, Suite 600
Dallas, TX 75254
(214) 886 6942
06/06/2024

Honorable Randolph D. Moss
United States District Court
333 Constitution Avenue, N.W., Room 6710
Washington, DC 20001

Dear Honorable Judge Moss,

I am writing to you in regard to Mr. Brady Knowlton, whom I have known for the past five years. Mr. Knowlton has been instrumental in the founding of Desi DMS, a software solutions company that has developed the nation's first fully bilingual dealer management system software. This software is designed to help small auto dealerships, many of which are Hispanic family-owned and operated, manage their operations efficiently and protect their cash flows and business.

Mr. Knowlton's commitment to assisting these small businesses is commendable, especially in helping Hispanic owners overcome language barriers in their operations. His dedication to this cause goes beyond mere business interests; it reflects a genuine concern for the success and well-being of these families and their enterprises.

In addition to his visionary role, Mr. Knowlton has been deeply involved in the company's strategy and day-to-day operations. He is also a significant financial investor in Desi DMS. We are currently at a critical juncture where we are scaling up the deployment of our software. It is crucial for the survival and growth of Desi DMS to have Mr. Knowlton's continued direct involvement.

I am happy to provide any further information or clarification you may require.

Thank you for your attention to this matter.

Sincerely,

Subbayya Chowdary Yanamadala

DARIN BAIN
SOUTH DOCK RD
HOUSE NUMBER 399
PROVIDENCIALES
TURKS AND CAICOS

HONORABLE RANDOLPH D. MOSS
UNITED STATES CIRCUIT COURT
333 CONSTITUTION AVENUE N.W.
ROOM 6710
WASHINGTON, DC 20001

JUDGE MOSS,

THIS LETTER IS WRITTEN ON BEHALF OF BRADY KNOWLTON. I HAVE KNOWN BRADY AND HIS
FAMILY FOR OVER TEN YEARS. I WAS BORN AND RAISED IN TURKS AND CAICOS AND HAVE BEEN
OPERATING A FISHING CHARTER COMPANY THERE FOR MANY YEARS. I FIRST MET HIS BROTHER,
COREY KNOWLTON, IN 2010. I MET BRADY KNOWLTON AT HIS BROTHER'S HOME AROUND 2014.
WE HAVE BEEN FRIENDS SINCE.

IN EARLY 2023, I BEGAN THINKING ABOUT HOW TO START A RENTAL CAR COMPANY THAT WOULD
BRING THE CARS TO THE RENTERS AT THEIR HOTELS. I AM GETTING OLDER AND THE EARLY MORNING
FISHING ARE GETTING TOUGH ON ME. FINDING A WAY TO GET FINANCING TO BEGIN THIS NEW
BUSINESS WAS A BIG HINDRANCE. IT IS VERY DIFFICULT TO FIND A BUSINESS LOAN IN THE ISLANDS
AS THE BANKS ARE UNWILLING TO PROVIDE THEM TO THE LOCALS. IT SEEMED THAT THERE WAS
GOING TO BE NO WAY TO FIND THE MONEY HERE ON THE ISLAND. I JUST NEEDED SOMEONE TO GIVE
ME A CHANCE.

I CONTACTED BRADY AND HE WAS VERY HELPFUL. HE LOANED ME THE MONEY THAT I COULD NOT
GET FROM THE BANKS. I WAS ABLE TO BUY SOME CARS TO BEGIN MY NEW BUSINESS. IF IT WAS NOT
FOR MR. KNOWLTON, I WOULD NOT HAVE BEEN ABLE TO GET STARTED WITH IT. I AM VERY
GRATEFUL FOR HIS ASSISTANCE. I HOPE THAT YOU CAN TAKE TO ACCOUNT THAT HE IS A GOOD MAN
THAT HELPED ME WHEN OTHERS WOULD NOT.

RESPECTFULLY,


DARIN BAIN